DOLORI FABRICS, INC., Plaintiff,

v.

The LIMITED, INC., Lane Bryant, Inc., Brylane, Inc., Kenly Casuals, Inc., and Schneider Fabrics, Inc., Defendants.

No. 86 Civ. 6689 (JEL).

United States District Court, S.D. New York.

June 10, 1987.

Schwartz & Schlacter, New York City by Jed R. Schlacter, for plaintiff.

Frank J. Colucci, P.C., New York City, for Brylane, Inc. and Lane Bryant, Inc.

Locker Greenberg & Brainin, New York City by Frederick B. Locker, for Kenly Casuals, Inc.

LUMBARD, Circuit Judge: *

Dolori Fabrics, Inc. commenced this action after its president, Donald Fixelle, purchased from two fashion catalogues dresses made from fabric which Dolori contends infringes upon one of its copyrighted designs. Dolori seeks damages and injunctive relief under the federal copyright laws, 17 U.S.C. § 101 *et seq.*, against Brylane, Inc., the publisher of the catalogues and retailer of the allegedly infringing dresses; Lane Bryant, Inc., Brylane's sister company; The Limited, Inc., the parent corporation of Brylane and Lane Bryant; and Kenly Casuals, Inc., a/k/a Kenly Manufacturing Co., Inc., the manufacturer of the gar-

---

* Sitting by designation.

ments.[1] Brylane cross-claims against Kenly to enforce an indemnification agreement and the warranty against infringement codified in N.Y. U.C.C. § 2–312.

The court holds that Brylane and Kenly infringed upon Dolori's copyright and therefore grants judgment in favor of Dolori against Kenly for $3,718.84 in damages plus an additional $15,000.00 in attorney's fees; against Brylane for $36,647.76; and against both Kenly and Brylane, in joint and several liability, for $7,052.76. Because The Limited and Lane Bryant played no part in infringement, the court dismisses Dolori's claims against them. Finally, judgment under N.Y. U.C.C. § 2–312 is granted to Brylane against Kenly in the amount of $36,647.76. Brylane may also recover from Kenly whatever portion of the joint and several liability of the two companies that Brylane pays to Dolori.

## I. *Facts*

Dolori is a textile converter. A textile converter buys unpatterned and uncolored fabrics, known as greige goods, arranges to have them patterned and finished, and then sells the finished products to garment manufacturers and other fabric users. Kenly manufactures and sells women's dresses and sportswear to retailers. Brylane vends women's fashions through six catalogue lines, which include the "Lane Bryant" and "Tall Collection" catalogues. Lane Bryant operates outlets for women's apparel in various malls and shopping centers throughout the country. Both Brylane and Lane Bryant are wholly-owned subsidiaries of The Limited.

Prior to 1982, Lane Bryant consisted of both a retail division and a mail order division. In 1982, The Limited acquired Lane Bryant and split the two divisions into separate corporations, the retail division becoming Lane Bryant, Inc., and the mail order division, Brylane, Inc. The two companies now have distinct officers, buyers, staffs, places of business, vendors, and merchandise. Neither Lane Bryant nor

The Limited purchased or sold any of the infringing garments.

In the summer of 1985, Donald Fixelle, president of Dolori, and Louis Klahr, his partner, collaborated on a new design. They started with a fabric swatch of Dolori's successful pattern No. W–200, a twin print which exhibited a positive/negative look on two separate pieces of fabric—the first piece employing one color as background and the other as pattern, and the second piece of fabric reversing the two colors. Fixelle and Klahr set out to incorporate W–200's positive/negative look into one pattern on one piece of fabric. They also located a black and white floral swatch from their fabric library with a positive/negative pattern, and a photograph from an Italian magazine. This photograph depicts a model wearing a green and white dress with a floral, positive/negative design. Combining inspiration from these three sources, they attempted to create a flat, clean look with equal distribution of positive and negative sources.

Fixelle and Klahr next met with artist Pat Sperandeo, whom they often used for design work, and showed her the two fabric swatches and the magazine photograph. They explained to her the desired look and feel. Sperandeo then drew the pattern that Fixelle and Klahr had described into a design "repeat"—the actual two-dimensional pattern which a converter prints repeatedly onto the fabric. An artist draws a design repeat to permit the engraver to engrave the pattern; to insure that the pattern can be printed repeatedly onto the cloth without gaps; and to see how the pattern will actually appear on the cloth. When Sperandeo drew the repeat, she did not have the two floral swatches with her, but did have the magazine photograph. The repeat which Sperandeo drew was engraved and reproduced as pattern W–232. Dolori then registered the design with the Copyright Office and, on November 14, 1985 was granted a certificate of copyright registration, No. VAU 85–083.

---

1. Prior to trial, Dolori settled with Schneider Fabrics, Inc., a textile converter who finished

the fabric from which the dresses were made.

In November and December, 1985, and January, 1986, Dolori sold samples of W–232 on a matte georgette—an expensive, high-quality fabric—to a number of garment manufacturers, including Kenly. The samples employed a royal blue and black color scheme, a particularly popular combination in the fashion industry that year. Fixelle testified that the samples carried Dolori's copyright notice on the selvage, or nonusable border, of the material. A swatch of fabric finished by Dolori which clearly bears a copyright notice on its selvage supports this claim. Nevertheless, Kenly disputes this, pointing to a dress made from fabric sampled to it by Dolori which retains part of the selvage but bears no copyright notice. Visual inspection of this dress discloses that a substantial portion of the selvage has been cut off. The fact that no notice appears on the portion of the selvage that remains does not prove that the original fabric pattern lacked notice of Dolori's copyright. Consequently, the court credits Fixelle's testimony, buttressed by the swatch of fabric introduced by Dolori, and finds that the samples of pattern No. W–232 sold to Kenly provided notice of Dolori's copyright on the selvage.

Kenly never purchased any of Dolori's fabric after receiving the sample. Instead, Kenly passed some of the fabric to Schneider Fabrics, Inc., a rival textile converter, who then printed the allegedly infringing design on lesser-quality material—crepe—and sold the finished fabric to Kenly on February 28 and June 16, 1986. Kenly used the material to manufacture two different style dresses, which it sold to Brylane. These dresses appeared in Brylane's "Lane Bryant" and "Tall Collection" catalogues—one style in each catalogue—beginning in May, 1986. Brylane subsequently sold both dress styles through its mail order system.

When Fixelle received copies of the "Lane Bryant" and "Tall Collection" catalogues in late June or early July, 1986, he spotted the garments made from the fabric manufactured by Schneider. Fixelle immediately visited his attorney, who, on July 9, 1986, sent a letter to Lane Bryant, Inc. demanding that it stop selling the infringing garments and requesting information about the manufacturer. This letter did not state where Fixelle had seen the dresses. Upon receipt of the letter, Lane Bryant searched through its inventory, but, as it did not sell any dresses made from Schneider's fabric, found nothing which "remotely resemble[d]" Dolori's pattern.

On July 15, 1986, Lane Bryant reported the results of its search to Fixelle's attorney. Dolori responded, in a letter dated July 25, 1986, and for the first time mentioned that the dresses had appeared in a "Lane Bryant" catalogue. Aware that Lane Bryant's sister company Brylane published the "Lane Bryant" catalogue, controller Joel Silverman wrote back to Dolori on July 28, 1986, and suggested that Dolori direct its correspondence to Stan Silver, Silverman's counterpart at Brylane. Neither Lane Bryant nor Dolori made any subsequent attempt to contact Brylane until this suit commenced. In the meantime, Fixelle ordered two dresses, one from each catalogue, which he received in August, 1986.

Dolori filed this action on August 28, 1986, and on the same day served on the defendants an order to show cause why a preliminary injunction should not issue. The order to show cause contained a temporary restraining order, signed by Judge John M. Walker, Jr. When Judge Walker denied Brylane's application to stay issuance of the TRO, made pursuant to Fed. R.Civ.P. 65(b), Brylane's president Peter Canzone ordered the items "frozen in stock." Accordingly, Brylane pulled the dresses from future printings of the catalogues and cancelled any outstanding orders from customers. However, Brylane's records show that it received 732 dresses of style No. 103–3506 from Kenly on August 29, 1986, one day after the issuance of the TRO, and that only 628 dresses of that style now remain in stock. Thus, Brylane must have shipped at least 104 garments after it had been served with the TRO. Defendants thereafter stipulated to the continuance of the TRO without admission of liability. The case proceeded to trial on February 19 and February 25, 1987.

## II. *Liability of Lane Bryant and The Limited*

At trial, Dolori agreed to dismiss its action against The Limited, admitting that the company had no responsibility for any infringement by its wholly-owned subsidiary. For the same reason, the court also dismisses Dolori's claim against Lane Bryant, Inc. Although Dolori does not claim that Lane Bryant either purchased or sold the infringing garments, it suggests that this court may impute Bylane's liability to its sister company. However, "a corporation, absent findings of fraud or bad faith, is entitled to a presumption of separateness from a sister corporation even though both are owned and controlled by the same persons." *Crown Central Petroleum Corp. v. Cosmopolitan Shipping Co.*, 602 F.2d 474, 476 (2d Cir.1979).

A court may disregard the corporate form only if it "determine[s] that there is such unity of interest and ownership that separate personalities of the corporations no longer exist, and that failure to disregard the corporate form would result in fraud or injustice." *Oriental Commercial and Shipping Co. v. Rosseel, N.V.*, 609 F.Supp. 75, 78–79 (S.D.N.Y.1985). Here, the two companies showed meticulous respect for corporate formalities. The fact that both license the tradename "Lane Bryant" from a third company—Brylane for one of its catalogues and Lane Bryant for its retail operation—does not, by itself, justify piercing the corporate veil.

Nor has Dolori demonstrated bad faith or fraud. When Dolori advised Lane Bryant of its claims of infringement, Lane Bryant did all that it could be expected to do. After receiving Dolori's first letter, which gave Lane Bryant no reason to suppose that Dolori's claim of infringement actually referred to Brylane, Lane Bryant made a search of its inventory, failed to find any fabric which might infringe on Dolori's copyright, and then promptly reported its findings to Dolori. When Dolori's second letter mentioned the "Lane Bryant" catalogue, thus alerting Lane Bryant to the possibility that Brylane might be involved, Lane Bryant immediately referred Dolori to the responsible officer at Brylane.

## III. *Liability of Kenly and Brylane*

### A. *Originality of Dolori's Design*

Kenly and Brylane challenge the validity of Dolori's copyright, claiming that it lacks originality, "the one pervading element prerequisite to copyright protection...." 1 M. Nimmer, *Nimmer on Copyright* § 2.01 at 2–5 (1986); *see also L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 489–90 (2d Cir.) (en banc), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). Kenly and Brylane contend that Dolori's design amounted to little more than a copy of the design pictured in the Italian fashion magazine. They point to the fact that artist Pat Sperandeo had only that photograph with her when she drew the design repeat, neglecting to mention that Fixelle and Klahr had earlier discussed their design with her and shown her two swatches of cloth in addition to the magazine photograph. Kenly and Brylane also place great reliance on the testimony of Howard Scott, a seventeen-year veteran of the print business who presently works as a vice president at "The Hampton Print Works," a textile converter. Scott testified that Dolori's pattern no. W-232 was "almost identical" to the photograph from the Italian fashion magazine. He continued, "I don't think I would attempt to copyright a design like this because it's so close."

A Copyright Office certificate of registration, if timely obtained, "constitute[s] prima facie evidence of the validity of the copyright...." 17 U.S.C. § 410(c). Nevertheless, a litigant may attempt to rebut the presumption of copyright validity, and "[w]here other evidence in the record casts doubt on the question, validity will not be assumed." *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980).

The requirement of originality does not present Dolori with a difficult hurdle to clear. The Second Circuit has variously characterized the test of originality as " 'modest,' 'minimal,' and as establishing a 'low threshold'...." *Durham Industries, supra*, 630 F.2d at 910 (citing cases). As

Professor Nimmer explained, "the line to be drawn includes almost any independent effort on the side of sufficient originality. Any 'distinguishable variation' of a prior work will constitute sufficient originality to support a copyright if such variation ... is more than merely trivial." 1 M. Nimmer, *supra*, § 2.01[B] at 2–11. Originality does not demand "invention in the sense of striking uniqueness, ingeniousness, or novelty.... Originality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying." *L. Batlin & Son, supra*, 536 F.2d at 490 (cites omitted). In the words of Judge Frank, "[a]ll that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.' Originality in this context 'means little more than a prohibition of actual copying.'" *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–03 (2d Cir.1951) (footnotes omitted).

■ The court finds Dolori's design to be sufficiently original to support a copyright. We agree with Fixelle's description of the photograph's design as "very muddled and tonal and dimensional", while his pattern is "flat and clean" and has an equal positive/negative distribution. Nor does the fact that Dolori's artist Pat Sperandeo used the photograph when she drew up the design require a different result. As Kenly's expert witness Howard Scott conceded during cross-examination, industry members commonly "shopped stores" and relied upon fashion magazines to generate new design ideas; indeed, his own firm had resorted to similar techniques in the past. Thus, the court concludes Dolori's design—a distinguishable variation of the design portrayed in the Italian fashion magazine—contains the modicum of originality necessary for copyright protection.

### B. *Infringement*

■ Even giving due consideration to the derivative nature of Dolori's work, *Durham Industries, supra*, 630 F.2d at 909, the court finds that defendants' pattern infringed upon Dolori's design. Where direct evidence of copying is unavailable, copying may be inferred from an alleged infringer's access to the copyrighted work and "substantial similarity" between the works. *E.g., Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 654 F.2d 204, 207 (2d Cir.1981); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir.1977). As Dolori sampled its work to Kenly, Kenly had access to Dolori's pattern.

Substantial similarity must be determined by the "ordinary observer" test. Under this test, as formulated by Judge Learned Hand over a quarter of a century ago, two patterns will be deemed substantially similar if "the ordinary observer, unless he sets out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). In other words, a court should find substantial similarity if "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966).

■ Defendants' pattern is an exact copy, line for line, flower for flower, color for color, of Dolori's work, except that Dolori's design repeats every 25¼ inches while the defendants' design repeats every 18 inches. Placing a sample of Dolori's floral design on top of one of the dresses manufactured by Kenly and sold by Brylane shows the infringing design exactly duplicates the first 18 inches of Dolori's pattern; and then repeats that identical 18 inches over and over again. Thus, the court concludes that an average lay observer would recognize that defendants' pattern had been appropriated from Dolori's copyrighted design. *Ideal Toy, supra*, 360 F.2d at 1022.

■ Kenly's argument that it would be contradictory to find both originality of Dolori's pattern and infringement forgets that the two tests are entirely different. *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 (2d Cir.1982). A work may

be copyrighted even if it is substantially similar to a preexisting work produced by another, *id.;* 1 M. Nimmer, *supra,* § 2.01[A] at 2–7–8. However, the copyright protection afforded a derivative work extends only to the incremental contributions of the second author. 17 U.S.C. § 103(b). *See generally* 1 M. Nimmer, *supra,* § 3.04; J. Patry, *Latman's The Copyright Law* 28 & n. 52 (6th ed. 1986). Here, Kenly and Brylane infringed on Dolori's original contribution to the floral design and thus should be held accountable. *See Financial Information, Inc. v. Moody's Investors Service, Inc.,* 751 F.2d 501, 510–11 (2d Cir.1984) (Newman, *J.,* concurring). In other words, even W–232's derivative nature does not forgive exact copying.

### C. *Intent*

■ The court finds that Kenly intentionally infringed upon Dolori's copyright: it received samples of Dolori's pattern directly from Dolori; those samples bore notice of Dolori's copyright; instead of purchasing from Dolori, Kenly gave samples to a rival textile converter, who printed Dolori's design on cheaper cloth and then sold it to Kenly.

■ On the other hand, Brylane's infringement was unintentional: Brylane never sampled this pattern from Dolori; as no one purchased Dolori's pattern, except as samples, until April, 1986, it was not circulating in the marketplace; Brylane never received notice, until the commencement of this suit, that the pattern infringed upon Dolori's copyright; Dolori's copyright notice on the selvage had been removed during the manufacture of Kenly's sample dresses and never reached Brylane; and most important, Brylane dealt with a reputable dress manufacturer who had no history of copyright infringement.

Finally, Brylane had no obligation to undertake a copyright search. *See In Design v. S. Rothschild & Co.,* 1986 Copr.L.Dec. (CCH) ¶ 25,890 at 20,073 (S.D.N.Y.1986) [Available on WESTLAW, DCT database] ("Defendant was under no obligation, having bought the garment at Macy's, a reputable department store, and finding no indi-

cation that the design was not in the public domain, to make a search to determine whether it had copyright protection."). Brylane purchases thousands of garments from nearly 500 suppliers within a year's time. The burden of researching each floral pattern—the most common design in the industry—obtained from a reputable manufacturer would be unreasonable.

■ Dolori counters that Brylane's shipment of 104 garments after it received the TRO signed by Judge Walker on August 28, 1986 proves intentional infringement. The court disagrees. Brylane's president, Peter Canzone, testified that upon receiving the TRO, he immediately ordered that both styles be frozen in stock—in other words, no more orders were to be filled and existing orders were to be refunded. As with any large organization, orders cannot be implemented instantly; they require a certain amount of time to work their way to the line from management. As everything else points to Brylane's good faith, and Brylane had no advance notice that it was to be served with a TRO, the shipment of 104 garments before Canzone's orders could be implemented does not, by itself, prove that Brylane intentionally infringed on Dolori's copyright.

■ However, Brylane's unintentional infringement does not, as it claims, exempt it from liability under 17 U.S.C. § 405(b). That section provides, in pertinent part, "Any person who innocently infringes a copyright, *in reliance upon an authorized copy . . . from which the copyright notice has been omitted,* incurs no liability for actual or statutory damages under section 504 for any infringing acts committed before receiving actual notice. . . ." As the plain words of the statute make clear, this section only applies where a defendant has been misled by omission from "an authorized copy." *See* 17 U.S.C. § 405, note; *Ruskin v. Sunrise Management, Inc.,* 506 F.Supp. 1284, 1289 (D.Colo.1981); 2 M. Nimmer, *supra,* § 7.14[B][2][c] at 7–107. Here, Brylane was not misled by the omission of the notice from *authorized* copies, but from *unauthorized* ones—the dresses

sold by Kenly. Accordingly, section 405(b) does not shield Brylane from liability.

## IV. *Relief*

### A. *Double-Counting*

Section 504(b) of the Copyright Act entitles the owner of a copyright "to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and *are not taken into account in computing actual damages.*" 17 U.S.C. § 504(b) (emphasis added). Kenly contends that the italicized language precludes this court from awarding Dolori both actual damages and Kenly's profits. The court disagrees. In *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 471 (2d Cir.1985), Chief Judge Feinberg concluded that forcing a distributor to disgorge the profits from its sales in addition to reimbursing the plaintiff manufacturer for the profits it would have earned "contain[ed] no element of double-counting." The manufacturer "could not have made the [sales which the distributor had made] and therefore cannot claim any lost profits on them." *Id.*

Similarly, Dolori did not compete for, and therefore could not have made, the same sales as either Kenly or Brylane. Dolori may therefore recover from Kenly and Brylane both its actual damages and their profits due to the infringement. *See also Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357, 363 (7th Cir.1985); *Taylor v. Meirick*, 712 F.2d 1112, 1119–21 (7th Cir.1983). *See generally* 3 M. Nimmer, *supra*, § 14.01[A] at 14–4; J. Patry, *supra*, at 287–88. *Abeshouse* also answers Kenly's contention that this court may not order it to disgorge its profits to Dolori because the two companies compete in different markets.

### B. *Dolori's Damages*

The court finds Dolori would have made Schneider's sales to Kenly—who had been and still is Dolori's customer as well as Schneider's—had Schneider not been selling the infringing fabric. *E.g., Stevens Linen Associates, Inc. v. Master-*

*craft Corp.*, 656 F.2d 11, 15 (2d Cir.1981); *Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F.Supp. 404, 407 (N.D.Ill.1976); 3 M. Nimmer, *supra*, § 14.02[A] at 14–9. The court rejects Dolori's argument that it should be awarded lost profits on the sale of the more expensive matte georgette fabric rather than on the sale of the less expensive crepe fabric which Schneider actually sold to Kenly. It strains credulity to suggest that Dolori, a textile converter who regularly printed its designs on crepe fabric, would have refused to do so here if Kenly had placed such an order. Nor will the court speculate as to whether Dolori would have made the additional sales necessary to supply those orders which Brylane received from its mail order customers but never filled because of the pendency of this lawsuit.

Fixelle testified that Dolori would have sold the crepe imprinted with W–232 for $2.15 to $2.25 a yard and that Dolori works on a 30 percent markup. The court selects the median figure of $2.20, resulting in a finding that Dolori would have earned 66¢ per yard profit ($2.20 × .3). Kenly purchased 10,686 yards from Schneider. Dolori's actual damages thus amounts to $7,052.76 (10,686 yards times 66¢ profit per yard). Kenly and Brylane are jointly and severally liable for this amount, but not for each other's profits. *Abeshouse, supra*, 754 F.2d at 472.

### C. *Kenly's Profits*

Kenly attacks the causality between its sales to Brylane and its infringement. The profits from these dresses, its argument runs, resulted not from Dolori's design but rather from the style of the dress and the royal blue and black color scheme, which was especially popular that year. Kenly may not escape liability so easily. The fact that defendants felt compelled to infringe Dolori's copyright represents sufficient proof of the link between the attraction of the dresses and Dolori's design.

We then turn to the computation of Kenly's profits. The parties introduced four different computations of the number of dresses sold by Kenly to Brylane: Bry-

lane's summary of purchase orders indicates that it received 1,377 of the dress style 103–3506 advertised in the "Lane Bryant" catalogue (the first style), and 1,294 of the style 4–8668 advertised in the "Tall Collection" catalogue (the second style), for a total of 2,671 dresses. Brylane's summary profit and loss statement states that it received 1,370 of the first style and 1,290 of the second style, for a total of 2,660. Kenly's profit and loss statement shows that it sent to Brylane 1,377 of the first style, receiving 118 chargebacks, and 1,115 of the second style, for a total of 2,492. Finally, Brylane's "Responses to Plaintiff's First Request for the Production of Documents" suggests that Brylane's "actual sales" of the two styles consisted of 2,660 units and that Brylane "presently [had] in inventory" 522 units, for a total of 3,182. Brylane's "Responses" did not distinguish between the two styles.

■ The court rejects the figures reported in Brylane's "Responses" as not credible. The 3,182 figure deviates too significantly from the other estimates of the number of dresses sold, all of which center around 2,660. Moreover, the number that Brylane reported under "actual sales" coincides closely with the other estimates, suggesting that Brylane may have mistakenly reported the total number of garments received under the actual sales category. We select the highest remaining figure— 1,377 of the first style and 1,294 of the second—for use. 3 M. Nimmer, *supra*, § 14.03[C] at 14–25 ("Where the computation of profits is uncertain due to the failure of the defendant to keep adequate records of costs, any doubt in the evidence will be resolved in favor of the plaintiff.") (footnote omitted).

Kenly's total revenues for 1,377 units of the first style at $17.50 a piece equals $24,097.50. From total revenues, certain costs must be deducted to determine profits. Dolori does not quarrel with Kenly's deduction of $5.24 per garment for the cost of manufacture, and $9.08 per garment for the cost of labor. Kenly calculated overhead costs by determining what percentage of its total sales revenues was represented by overhead costs (8.24%), and then multiplying that figure by the sales price of the first dress style—$17.50—to arrive at an overhead cost allocation of $1.44 per dress. The court finds that Kenly provided an acceptable formula for allocating its overhead costs and therefore allows the deduction of $1.44 per garment for allocated overhead. 3 M. Nimmer, *supra*, § 14.03[C] at 14–23–24.

■ Dolori also takes issue with Kenly's deduction of 12¢ per garment for packing expenses, apparently because the invoices presented as documentary support did not deal directly with the cost of packing for the infringing garments. The court concludes that the 12¢ per garment packing expense stayed uniform during the time period in question, and therefore may properly be deducted from the profits. Kenly thus earned a profit of $1.62 on each garment of the first style sold ($17.50 minus $5.24 minus $9.08 minus $1.44 minus $.12), giving it a total profit of $2,230.74 ($1.62 times 1,377) on the first style. Kenly will not be allowed a deduction for 118 alleged "chargebacks". *See* 3 M. Nimmer, *supra*, § 14.03[C] at 14–22 ("Defendant may not deduct the cost of those infringing copies for which no gross revenues were derived either because they were not 'sold' or were later returned.") (footnote omitted).

Kenly sold 1,294 dresses of the second style at $18.00 each for total revenues of $23,292.00. The court credits Kenly's $17.34 per garment deduction for manufacture, labor, packing and administrative costs with two exceptions. The court rejects 6¢ of Kenly's 10¢ per garment deduction for the costs of buttons—2¢ per button for 5 buttons per garment when, in fact, the second style uses only 2 buttons—and Kenly's 43¢ per garment deduction for "freight in" expenses, representing the cost of shipping in the raw materials. Kenly produced no evidence in support of its alleged freight expenses except the unsubstantiated assertions of its president. Accordingly, Kenly may only deduct $16.85 per garment ($17.34 minus 6¢ minus 43¢), and earned $1.15 profit per garment. Ken-

ly's profit on the second style comes to $1,488.10 (1,294 garments times $1.15 profit per garment). Kenly's profits thus totaled $3,718.84 ($2,230.74 plus $1,488.10).

### D. *Brylane's Profits*

As stated above, Brylane received from Kenly 1,377 dresses of the first style and 1,294 dresses of the second style. Brylane's records indicate that it presently has in stock 119 dresses of the first style and 628 dresses of the second style. Subtracting the two sets of figures, the court finds that Brylane actually sold 1,258 dresses of the first style (1,377 received minus 119 still in stock) at a price of $34.99 per garment, and 666 dresses of the second style (1,294 received minus 628 still in stock) at a price of $39.99 per garment. Thus, Brylane's total revenues amounted to $44,017.42 (1,258 times $34.99) and $26,633.34 (666 times $39.99), respectively.

█ From total revenues, Brylane may subtract the costs to it of the dresses it actually sold—$22,015 (1,258 dresses times $17.50 per dress) for the first style and $11,988 (666 times $18.00) for the second. Brylane may not likewise deduct the costs of the dresses it still has in stock. 3 M. Nimmer, *supra,* § 14.03[B] at 14–22. As the 104 garments sold after August 28 were not sold in violation of the TRO but before the TRO could be implemented, Brylane's liability for the garments extends only to its profits and not to its gross revenues. *See Stevens Linen, supra,* 656 F.2d at 16.

█ Brylane also claims two additional deductions, which the court disallows. First, Brylane attempts to subtract an allocated overhead expense. Brylane's vice president and financial reporting controller, Ralph Bucci, made Brylane's only attempt to explain how it allocated the overhead: "it is a flat percentage that we use across the board for all products." He did not state of what it is a percentage nor how Brylane arrived at that percentage. Brylane thus failed to carry its burden of proving an acceptable formula for overhead allocation.

As to Brylane's claimed deduction for its advertising expenditures, Brylane admittedly receives subsidies from some of its largest suppliers to help defray its advertising expenditures. However, Brylane did not reduce its alleged advertising deduction to reflect these subsidies, nor could Ralph Bucci, Brylane's financial controller, specify the amount of these subsidies when asked during cross-examination. Brylane cannot complain that it had no notice that such inquiry would be made, as Dolori had served it with a subpoena prior to trial— which Brylane ignored—requesting documents on precisely this same subject. As the court cannot determine what portion of Brylane's advertising expenditures were subsidized, the deduction is not allowed. *E.g., Chesa International, Ltd. v. Fashion Associates, Inc.,* 425 F.Supp. 234, 238 (S.D. N.Y.), *aff'd,* 573 F.2d 1288 (2d Cir.1977).

Thus, Brylane earned a $22,002.42 profit on the first style ($44,017.42 total revenues minus $22,015.00 cost of dresses from Kenly) and a profit of $14,645.34 on the second style ($26,633.34 minus $11,988.00). Brylane's total profits add up to $36,647.76.

### E. *Attorney's Fees*

█ Under the Copyright Act, this court "in its discretion" may "award a reasonable attorney's fee to the prevailing party...." 17 U.S.C. § 505. *See also Roth v. Pritikin,* 787 F.2d 54, 57 (2d Cir.1986). Dolori requests $22,500 in attorney's fees for 150 hours work. In general, this provision has been sparingly used and the amounts awarded modest. *Roth,* 787 F.2d at 57. However, attorney's fees are "particularly appropriate where plaintiff is a small business," such as here, J. Patry, *supra,* at 292, and Professor Nimmer has commented that, "an attorney's fee generally will be awarded only where there is some element of moral blame against the losing party. Thus an attorney's fee may be awarded where the losing party is a deliberate infringer...." 3 M. Nimmer, *supra,* § 14.10[D] at 14–75 (footnotes omitted). After due consideration, *Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir.1983) (per curiam), the court awards attorney's fees of $15,000 to Dolori against Kenly, a deliberate infring-

er, but not against Brylane, who unintentionally infringed on Dolori's copyright.

### F. *Injunction*

Dolori asks the court to enjoin permanently Kenly and Brylane from further infringement. The Copyright Act authorizes a court to issue a permanent injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The Court recognizes that an injunction is an "extraordinary remedy" which ordinarily should not be granted where a plaintiff has not proven a probability or threat of continuing or additional infringements. 3 M. Nimmer, *supra*, § 14.06[B] at 14–54–55.

■ The court sees no need for an injunction against either Kenly or Brylane. Kenly has no history of copyright infringement; Dolori has not shown any probability that Kenly would resume its infringement in the future; Dolori and Kenly maintain a business relationship which would deter future infringements; an injunction would severely damage Kenly's reputation; and Dolori's design retains little market value. Thus, there exists little possibility of future infringement by Kenly. Brylane, being an innocent infringer and having ceased its infringement immediately upon receiving notice, sits in even a better position. Moreover, Brylane's president Peter Canzone testified that Brylane does not intend to sell the approximately 800 infringing garments which it still retains in its possession; instead, he proposes to return them to Kenly. The court therefore also declines to issue an injunction against Brylane.

### V. *Cross-Claims*

Brylane cross-claims against Kenly, seeking to enforce an alleged indemnification agreement contained in the purchase orders for the infringing dresses and, alternatively, to secure indemnification under N.Y. U.C.C. § 2–312(3). In its answer, Kenly denies the existence of a contract of indemnification, pointing to N.Y. U.C.C. § 2–207 (Additional Terms in Acceptance or Confirmation), and generally denies Brylane's warranty claim. These cross-claims fall within this court's ancillary jurisdiction. *E.g., United States v. Gilbert*, 478 F.Supp.

306, 311–12 (S.D.N.Y.1979); 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3523 at 109 (2d ed. 1984).

■ The court dismisses Brylane's first cross-claim against Kenly for failure to prove an enforceable contract of indemnification. Nevertheless, section 2–312(3) of the Uniform Commercial Code entitles Brylane to indemnification from Kenly. That section states, in relevant part: "Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like...." The broad language of this section, comprehending "infringement or the like," applies to claims of copyright infringement although the Official Comment explicitly refers only to "claim[s] of infringement of a patent or trademark by a third party." *See* J. White & R. Summers, *Uniform Commercial Code* 364 (2d ed. 1980) (section 2–312(3) applies to claims similar to patent and trademark infringement). The policy underlying this statute—that a merchant who regularly deals in like goods has a duty to insure that no claim of infringement by a third party mars the buyer's title—applies equally well to claims of copyright infringement.

The court finds that Kenly is a merchant dealing regularly in the sale of women's dresses and that Kenly received the required notice of the pending action when it was named codefendant in this suit along with Brylane. N.Y. U.C.C. § 2–607(3)(b). As the statutory prerequisites have been met, the court grants judgment to Brylane against Kenly on its cross-claim under § 2–312(3).

Brylane, in its cross-complaint, requests this court, in the event it is found liable to Dolori, to direct Kenly to pay the amount of that judgment, together with Brylane's attorney's fees, costs, and disbursements. However, Brylane never presented evidence of any damages beyond the amount of this judgment. Accordingly, the court grants judgment to Brylane against Kenly for $36,647.76—the liquidated amount of Brylane's liability to Dolori—plus whatever portion of Kenly's and Brylane's joint liability which Brylane pays to Dolori.

## VI. *Conclusion*

In summary, the court directs entry of judgment in favor of Dolori Fabrics, Inc. against Kenly Casuals, Inc., a/k/a Kenly Manufacturing Co., Inc. in the amount of $3,718.84 in damages plus $15,000.00 in attorney's fees; against Brylane, Inc. for $36,647.76 in damages; and against both Kenly and Brylane, in joint and several liability, for an additional $7,052.76 in damages. The court further directs entry of judgment in favor of Brylane, Inc. against Kenly Casuals, Inc., a/k/a Kenly Manufacturing Co., Inc. in the amount of $36,647.76 plus whatever portion of the two companies joint and several liability which Brylane may be required to pay to Dolori. Finally, the court dismisses Dolori Fabrics, Inc.'s claims against The Limited, Inc. and Lane Bryant, Inc.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.