IN DESIGN, alternate trade name
of Hukafit Sportswear, Inc.,
Plaintiff,

v.

LAUREN KNITWEAR CORPORATION,
Defendant.

IN DESIGN, alternate trade name of Hukafit Sportswear, Inc. and Jeffrey Rogers Knitwear Productions Ltd., Plaintiffs,

v.

PETRIE STORES CORPORATION,
Defendant.

IN DESIGN, alternate trade name
of Hukafit Sportswear, Inc.,
Plaintiff,

v.

ZAYRE CORPORATION, Defendant.

Nos. 87 Civ. 0206 (CHT), 87 Civ. 0521
(CHT) and 88 Civ. 8858 (CHT).

United States District Court,
S.D. New York.

Oct. 1, 1991.

Gottlieb, Rackman & Reisman, P.C., New York City (George Gottlieb, of counsel), for plaintiffs.

Schlacter & Schlacter, New York City (Jed R. Schlacter, of counsel), for defendants.

## OPINION

TENNEY, District Judge.

Plaintiff In Design, alternate trade name of Hukafit Sportswear, Inc. ("Hukafit") brought this copyright infringement action against defendants Lauren Knitwear Corporation ("Lauren"), Petrie Stores Corporation ("Petrie"), and Zayre Corporation ("Zayre"). Hukafit alleges that the defendants violated its copyright in a sweater design by manufacturing and selling sweaters in the same design. Hukafit seeks damages and attorney's fees, as well as prejudgment interest. For the reasons set forth below, the court finds that the defendants infringed Hukafit's copyright, and are liable to Hukafit for the following amounts: Lauren for $122,480; Petrie for $51,632; and Zayre for $46,254. In addition, the court grants plaintiff's request for attorney's fees in the amount of $103,688, but denies its request for prejudgment interest.

## BACKGROUND

Hukafit is a New York corporation which manufactures and sells women's knit sweaters to retail stores for resale to the public.[1] Trial Transcript ("Tr.") 4–5. Hukafit was founded in 1982 by David Binder, who, since that date, has been the company's managing director. Tr. 4, 6–7. Mrs. Muriel Binder, Mr. Binder's wife, has been

---

1. Hukafit's principal place of business is at 1431 Broadway, New York, New York 10018. Tr. 4–5.

employed by Hukafit since 1982, and since that time, has been responsible for advertising and publicity as well as for maintaining Hukafit's copyright program.[2] Tr. 83–86.

In 1985, Mr. Binder traveled to England in search of new graphic designs for Hukafit's knitwear. Tr. 9–10. After discovering the work of Sasha Kagan of Llanidloes, Powys, Whales, he commissioned Ms. Kagan to create new sweater designs that could be manufactured on commercial knitting machinery. *See* Tr. 10–11. Pursuant to such commission, Ms. Kagan created a design called "Triangles"[3] and hired a knitter to produce a sweater containing that design, which she then gave to Mr. Binder. Tr. 10–11, 36–41. Ms. Kagan then assigned all of her copyright rights in the Triangles design to Hukafit. Tr. 12–14; Pl.Exh. 2. The assignment document, which Ms. Kagan signed in the presence of Mr. Binder, provides that:

> Sasha Kagan who resides at Llanidloes, Powys, Wales, assigns to Hukafit Sportswear, Inc. of 1407 Broadway, New York, New York 10018, all of his/her copyright rights in a work entitled "Triangle" Style No. SK–4, as of the date of creation of such work.
>
> (Signed) Sasha Kagan<br>Name:

Dated: April 1st '85. Tr. 13; Plaintiff's Exhibit ("Pl.Exh.") 2. Hukafit recorded the assignment in the United States Copyright Office on November 18, 1985 and registered the copyright for the Triangles design as Registration No. VA 203 988, effective June 26, 1985. Tr. 15–17; Pl. Exhs. 1,2. The copyright is for a "Knit Design" entitled "Triangles," with an alternative title of "SK–4." Tr. 12–14; Pl.Exh. 1.

Hukafit then made between one and two dozen samples of the Triangles sweaters. Tr. 18–19. These samples were used in Hukafit's production department as samples, were displayed in Hukafit's showroom, and were shown to department stores who used them for their own meetings and advertising purposes. *Id.*

From 1985–86, Hukafit sold all of its sweaters by displaying them at Hukafit's showroom and by bringing the samples to customers in Atlanta, Georgia, Chicago, Illinois, and Los Angeles, California. Tr. 19. Hukafit also sold sweaters through its showroom presentation book—a large loose-leaf book containing illustrations of Hukafit's styles and corresponding style numbers. Tr. 20–21; Pl.Exh. 5. The presentation book contained pictures of the Triangles design sweaters which are labeled as Style Nos. 2124, 2100, 8146, and 8122, each of which appeared in different colors. Tr. 21; Pl.Exh. 5.

Hukafit sold its Triangles sweaters to department stores and specialty chain stores such as Saks Fifth Avenue, Lord & Taylor, Neiman–Marcus, J.W. Robinson, Bonwit Teller, Contempo and Goldwaters. Tr. 21, 23–24. One version of the Triangles sweater which was delivered to retail stores was made in the following colors: Kingfisher (Teal), Azalea (dark red/pink), Black, and Aran (Beige). Tr. 47–49; Pl. Exh. 3B (tag). All of the Triangles sweaters produced by Hukafit carried a copyright notice on their interior neck labels and on a label in the side seam of the sweaters' interiors. The same label also indicated that "In Design" is a trademark of Hukafit. Tr. 28–29; Pl. Exhs. 3A, 3B. Furthermore, Hukafit posted copyright signs on the walls and tables of its showroom, as well as in its presentation books. Tr. 20. In December 1985, Hukafit's Triangles sweaters and other "In Design" sweaters appeared in an advertisement for Bullocks Department Store in the Los Angeles Times. Tr. 25–27; Pl. Exh. 4A. A Triangles sweater was also featured in Nei-

---

**2.** Hukafit's copyright program involves all the tasks necessary for registering, publicizing, and policing the copyrights. Tr. 83–86.

**3.** Ms. Kagan's design appears as "Triangle" in the assignment document discussed *infra* and as "Triangles" in the certificate of copyright regis-

tration. *See* Pl.Exhs. 1, 2. Furthermore, the design has an alternative name of "Style No. SK–4," which refers to Sasha Kagan's Style No. 4. Tr. 11–13. For purposes of simplicity, the court will hereinafter refer to Ms. Kagan's design as "Triangles."

man–Marcus' mail catalog for Winter 1985. Tr. 27–28; Pl.Exh. 4B.

Defendant Lauren is a New York corporation which also manufactures and sells women's knit garments for resale to the public, containing neck labels featuring the phrase "Lauren Knitwear Corp."[4] Tr. 5. During the period 1985–86, Lauren did not design its own knitwear products, but rather obtained sweater designs from magazines and store windows. Tr. 136–37. Lauren also obtained designs through its "production man" who, after visiting different knitting mills, made production samples for Lauren to show in its showroom. Tr. 136. In addition, the production man occasionally visited Lauren's contractors to obtain ideas for the production samples. Tr. 136–37.

In 1985–86—the same period in which Hukafit was selling and advertising its Triangles sweaters—one of Lauren's employee's, Phil Moss, showed a garment to Lauren's chief executive officer, Marvin Lieberman. Tr. 138–39. This garment was the design source for the allegedly infringing sweaters sold by Lauren. Id. Mr. Lieberman saw the sweater from approximately twenty feet away and never examined it to see whether it contained a label or who designed it. Tr. 139–41. Furthermore, Mr. Lieberman never directed any copyright attorney to examine the sweater or its origin. Tr. 141–43. Ultimately, Mr. Lieberman authorized Mr. Moss to make the sweater, but to "change the colors around." Tr. 138–39, 143. Lauren manufactured five different styles of knit garments using this design: Style No. 9607 (sweater), Style No. 8607 (sweater), Style No. 5607 (skirt), Style No. 0707 (vest), and Style No. 1007 ("skimp" sweater).[5] Tr. 49–50; Pl.Exhs. 10A–E. Lauren then sold these garments to defendants Petrie and Zayre. Tr. 49–50; Pl. Exhs. 10A–E.

Defendant Petrie is a customer of Lauren's who owns and operates a large chain of retail stores that sells women's knit garments to the public.[6] Tr. 5. In the period 1985–86, Petrie was a chain store that sold moderately priced[7] clothing to a generally young clientele. See Tr. 29–31. During this period, Petrie purchased four of the styles listed above (Style Nos. 9607, 8607, 5607, and 707) from Lauren and resold them at retail prices. See infra. During the same period,[8] defendant Zayre was also one of Lauren's customers who sold women's knit garments to the public.[9] Tr. 5–6.

Hukafit sent written notices of infringement to Lauren and to Petrie by letters dated September 3, 1986. Tr. 64–65, 101; Pl. Exhs. 7,8. Each of these letters contained a photograph of Hukafit's Triangles sweater Style No. 8607 and a copy of the certificate of copyright registration. Id. Subsequently, however, a shopping service used by Hukafit to police its copyrights informed Hukafit that Petrie was still selling the allegedly infringing garments.[10] Pl.Exh. 16; Tr. 104. Hukafit therefore relayed this information to Petrie in a letter dated October 17, 1986, but did not specify which of the infringing styles were still being sold at the Petrie stores. Tr. 104–07; Pl.Exh. 16. Hukafit then sent Lauren a second notice, dated November 24, 1986,

---

**4.** Lauren's office and place of business is located at 1370 Broadway, New York, New York 10018. Tr. 5.

**5.** Lauren's "skimp" was a version of a sweater, and will hereinafter be referred to as a sweater.

**6.** Petrie is a corporation whose office and place of business is located at 70 Enterprise Avenue, Secaucus, New Jersey 07094. Tr. 5.

**7.** The prices of Petrie's sweaters ranged from $10 to $30. Tr. 29–30.

**8.** Although no evidence was presented on this issue, defendants assert that Zayre was sold to Ames Department Stores in 1988. See Defendants' Post-trial Memorandum of Law ("Def.Mem.") at 16.

**9.** Zayre was a corporation whose office and place of business was located at 770 Cochituate Road, Framingham, Massachusetts 01701. Tr. 5.

**10.** The shopping service operated through a group of investigators—a loose affiliation of housewives—who were located all over the country. Tr. 101–03; 111. Hukafit would send a photograph of an infringing garment to the shopping service, which investigators would then bring to local stores to ascertain whether that garment was still being sold. Id.

specifying the other style numbers (besides Style No. 8607) that allegedly infringed Hukafit's copyright. *See* Tr. 66–67, 152–53; Pl.Exh. 17. Lauren, however, did not inform any of Petrie's buyers about the existence of these additional styles. Tr. 153–56.

Subsequently, Petrie's Vice President and Controller, Michael Jackson, sent Lauren a notice of a claim for indemnity. Tr. 65–66; Pl.Exh. 9 (letter dated Sept. 8, 1989). The notice letter states that "[s]ince attached to [Hukafit's] letter they have provided us with copies of their registered copyright, we [Petrie] recognize no dispute of their demand." Pl.Exh. 9. The letter also refers to Lauren Style No. 8607, and indicates that copies were sent to Petrie's Corporation Counsel, Janet Joyce, and to one of Petrie's buyers, Judy Herman. Tr. 66.

## DISCUSSION

### A. *Jurisdiction*

The court has subject matter jurisdiction over this case pursuant to the 1976 Copyright Act ("Copyright Act" or "Act"). 17 U.S.C. §§ 101 *et seq.* (1982).

### B. *Infringement*

In order to prevail in a copyright infringement action, a plaintiff must prove that he owns the copyright and that defendant copied the copyrighted work. 3 M. Nimmer, Nimmer on Copyright § 13.01 at 13–4 (1990). Here, plaintiff has established both of these elements.

#### (1) Ownership of Copyright

■ The Copyright Act provides that a copyright registration certificate constitutes prima facie evidence of the plaintiff's ownership of the copyright. 17 U.S.C. § 410(c); 3 M. Nimmer, *supra,* § 13.01[A] at 13–5.

Defendants argue that plaintiff's registration is invalid because the underlying assignment lacks a certificate of acknowledgement. *See* Def.Mem. at 6–7. In support of their argument, defendants cite Sec-

tion 204(b) of the Copyright Act which provides that

> A certificate of acknowledgement is not required for the validity of a transfer, but is prima facie evidence of the execution of the transfer if ... in the case of a transfer executed in a foreign country, the certificate is issued by a diplomatic or consular officer of the United States, or by a person authorized to administer oaths whose authority is proved by a certificate of such an officer.

17 U.S.C. § 204(b). From this section, defendants conclude that because plaintiff's assignment agreement was executed in a foreign country and was not accompanied by a certificate of acknowledgement, it is not entitled to prima facie weight to prove the validity of the transfer. *See* Def.Mem. at 7.

The court, however, does not agree with defendants' interpretation of this section or with its applicability to this case. First, the legislative history of this section indicates that subsection (b) of section 204 "makes it clear that a notarial or consular acknowledgement is not essential to the validity of any transfer, whether executed in the United States or abroad." Notes on Committee on the Judiciary, House Report No. 94–1476, U.S.Code Cong. & Admin.News 1976, 5659, 5744, *quoted in* 17 U.S.C.A. § 204 note (West 1977). Thus, the section merely provides that certificates of acknowledgement which are executed abroad will be given the same prima facie weight as those executed in the United States. *Id.* Furthermore, plaintiff's assignment agreement contains all the requirements specified in section 204(a) and was properly authenticated at trial by one of the parties to the agreement, Mr. Binder. *See supra.* Thus, plaintiff's certificate of copyright registration is prima facie evidence of plaintiff's ownership of the copyright for the Triangles design. Accordingly, since defendants have presented no evidence to rebut this prima facie showing, the court finds that plaintiff owns the copyright for the Triangles design.[11]

---

**11.** Defendants also argue that plaintiff has not

established that the Triangles design is original

### (2) Copying

Since it is rarely possible to establish copying by direct evidence, a plaintiff can prove copying by showing (1) that the defendant had access to the work in question, and (2) that plaintiff's and defendant's works are substantially similar. M. Nimmer, *supra*, § 13.01[B] at 13–7 to 13–8.

### (a) *Access*

■ A plaintiff can establish access by showing that the defendant had the opportunity to copy the protected work. *See* M. Nimmer, *supra*, § 13.02[A] at 13–12 to 13–13. Furthermore, access becomes an unnecessary element of proving copying if there is a striking similarity between plaintiff's and defendant's work.[12] M. Nimmer, *supra*, § 13.02[B] at 13–16 to 13–17; *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 & n. 2 (2d Cir.1977).

Here, since plaintiff advertised and disseminated its sweaters to merchants in the garment industry, defendant Lauren had the opportunity to copy plaintiff's sweaters. Indeed, Lauren did not employ its own designer, but rather modeled its designs after the designs of other garments in store windows and catalogs. Furthermore, Lauren admitted that it did not independently create the design on the sweaters in question, but instead, merely changed and rearranged the colors of the source sweater. Tr. 138–43. The court therefore concludes that Lauren had access to Hukafit's Triangles knit design. Furthermore, as discussed below, plaintiff's and defendant's sweaters are so strikingly similar, that even if Lauren did not have access, the court could infer copying by the extent of similarity alone.

### (b) *Substantial Similarity*

■ Whether a defendant's product is substantially similar to the plaintiff's copy-

righted work is a question of fact which, in this Circuit, is determined by the "ordinary observer" test. M. Nimmer, *supra*, § 13.-03[E] at 12–62.7; *Malkin v. Dubinsky*, 146 F.Supp. 111 (S.D.N.Y.1956); *see Arnstein*, 154 F.2d at 468. The "ordinary observer test" is met if "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966). Moreover, if plaintiff's and defendant's works meet this test—i.e., they are substantially similar—it is immaterial that in many respects the two works are dissimilar. *See* M. Nimmer, *supra*, § 13.03[B][1][a] at 13–48 to 13–49.

Here, the basic unit of the design in plaintiff's sweater consists of a triangle element sitting on its side, its apex pointing to the left. Both sides of the triangle element have extensions, one of which extends further than the other. The other element of the triangles design consists of two short parallel lines that point toward the side of the triangle element with the extended leg. *See* Pl.Exh. 3B; Tr. 53–54. The combination of one triangle element and one pair of parallel lines repeats across the width of plaintiff's sweaters, making the design continue over the body of the garment. Each row is a different color, and the various rows inversely arranged so that the apexes of one row point in the opposite direction from those of the surrounding rows. *See* Pl. Exh. 3(b); Tr. 54–55. Between each row of triangles is a band of color which also extends across the width of the sweater. *See* Pl.Exh. 3B; Tr. 54–55.

Lauren's sweater design also contains triangular elements accompanied by parallel bars which are arranged in rows across the width of the sweater. Furthermore, the triangle elements of one row are also

---

or that Sasha Kagan created it. *See* Def.Mem. at 8–10. However, because plaintiff established prima facie ownership of its copyright, the burden shifts to defendants to counter plaintiff's evidence. *See* M. Nimmer, *supra*, § 13.01[A] at 13–6. Beyond the arguments contained in defendants' brief, defendants have produced no evidence to rebut plaintiff's prima facie case.

**12.** The rationale for this rule is that the more substantial the similarity, the less likely it is that defendant independently created a work identical to plaintiff's. M. Nimmer, *supra*, § 13.02[B] at 13–17.

inverted so that the apexes of adjacent rows point in opposite directions. *See* Pl. Exh. 10B; Tr. 55–56. The only differences between the two designs are that (1) Hukafit's sweaters are comprised of six colors, while Lauren's are made of four, and (2) the triangle element on Hukafit's sweaters are less horizontally tilted than those of the Lauren sweaters. *See* Tr. 58–59.

Defendants argue against substantial similarity based on their observations that the Lauren sweaters incorporate more colors than those of the plaintiff, and consequently give an entirely different "overall look." *See* Def.Mem. at 10–13. After comparing both sets of sweaters, however, the court rejects defendants' argument and concludes that Hukafit's and Lauren's sweaters are substantially similar if not almost identical. The court therefore finds that all three defendants infringed plaintiff's copyright in its Triangles design.[13]

## C. *Laches*

### (1) Zayre

Defendant Zayre requests the court to dismiss plaintiff's claim against it on grounds of laches. *See* Def.Mem. at 13. Zayre claims that plaintiff's delay in commencing its action was unreasonable, and that this delay prejudiced Zayre's case.

Whether a plaintiff's conduct constitutes laches is a question of fact "to be drawn from the equitable circumstances peculiar to each case." *Stone v. Williams*, 873 F.2d 620, 623–24 (2d Cir.), *vacated on other grounds*, 891 F.2d 401 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1989). The party asserting the laches defense must establish (1) that the delay was unreasonable and (2) that the delay resulted in prejudice. *See id.* at 624–25. Although the focus of the inquiry should not be the number of years that elapsed, *id.* at 624, a delay of two years does not usually constitute laches. *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 942 (7th Cir.1989) (plaintiff did not file action until two years after acquiring knowledge of defendant's infringement), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Furthermore, the prejudice must be caused by the defendant's reliance or change of position as a result of the delay. *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 534 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978).

Here, plaintiff knew of Zayre's infringement in September 1986, but did not commence its action against Zayre until December 1988. Tr. 46; Complaint, 88 Civ. 8858 (Dec. 16, 1988). According to Zayre, Ames Department Store bought all the Zayre stores at some point between September 1986 and December 1988. Def.Mem. at 16. Zayre argues, therefore, that because the employees who ordered the Lauren garments are no longer employed at Ames, and because neither Zayre nor Ames retained inventory and financial records as of December 1988, Zayre was prevented from gathering information about revenues and costs relating to the infringing Lauren garments. *Id.*

While the prejudice suffered by Zayre may well have been real, Zayre has failed to substantiate its claims with any evidence whatsoever. The record is completely devoid of any evidence regarding the efforts made by Zayre to contact its former employees or to obtain the records it now alleges are no longer available. Indeed, there is nothing in the record to even support the assertion that Ames bought all of Zayre's stores. The court therefore denies

---

**13.** Plaintiff urges the court to find that Lauren's and Petrie's infringement was intentional. *See* Pl. Reply Mem. at 6–7. Although defendants were not innocent infringers, *see Dolori Fabrics, Inc. v. Limited Inc.*, 662 F.Supp. 1347 (S.D.N.Y. 1987), plaintiff did not establish that either infringement was intentional. Although plaintiff established that Lauren had an opportunity to view Hukafit's design, plaintiff did not prove that Lauren actually knew that its source sweater for the infringing garments was designed by Hukafit. Hukafit asserts that Petrie is an intentional infringer because it has been involved in controversies with Hukafit over five different copyright infringement matters. However, because these controversies involved patterns other than the Triangles design, and because Petrie purchases its garments from a vendor, the court finds that Petrie is not an intentional infringer. *See Dolori*, 662 F.Supp. at 1354.

Zayre's request to dismiss Hukafit's action against it.

### (2) Petrie

■ Defendant Petrie argues that plaintiff unreasonably delayed notifying Petrie of all the infringing sweater styles, and because of this delay, Petrie was unable to recall all of the infringing items. *See* Def. Mem. at 17–21. In fact, Petrie alleges that plaintiff intentionally allowed Petrie to continue selling the infringing garments in order to accumulate revenue from which plaintiff could recover through this lawsuit. *See id.* at 20. According to Petrie, plaintiff failed to notify Petrie of four of the five styles until June 1987, when Petrie learned of these styles in the course of a settlement meeting.[14] Tr. 407–11. Petrie claims that it was prejudiced because it would have recalled these four infringing styles (as it did with Style No. 8607) thereby making its revenue on the garments substantially less. *See* Def.Mem. at 18.

The court, however, disagrees with Petrie's argument. Although plaintiff's letter of September 3, 1986 specified only one of Lauren's style numbers, the letter included a photograph of the infringing design. Petrie, therefore, could have easily checked its merchandise for a similar design or its purchases from Lauren to see whether there were other infringing styles. Thus, Petrie knew or should have known that it purchased the infringing design in not only Style No. 8607, but also Style Nos. 9607, 5607, and 0707.[15] Tr. 147–48, 230. The court therefore rejects Petrie's laches argument and denies its request to disregard the profits made on these items.

### D. *Damages*

The Copyright Act allows a plaintiff to recover both actual damages and any of the defendant's profits that are attributa-

ble to the infringement. *See* 17 U.S.C. § 504(b). Here, plaintiff seeks only defendants' profits. Plaintiff's Proposed Findings of Fact and Conclusions of Law Submitted Post-trial ("Plaintiff's Proposed Findings of Fact") at 48–52. The Act also provides that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses...." 17 U.S.C. § 504(b).

■ Although the burden is on the plaintiff to establish the defendant's profits, any uncertainty as to profits that is caused by the defendant's failure to keep adequate records of costs will be resolved in favor of the plaintiff. *Shapiro, Bernstein & Co. v. Remington Records, Inc.,* 265 F.2d 263, 272–73 (2d Cir.1959); *see also Update Art, Inc. v. Modiin Pub., Ltd.,* 843 F.2d 67, 72 (2d Cir.1988) (defendant's "unjustified failure to respond to discovery orders was the *cause* of the lack of evidence necessary precisely to determine damages"). Furthermore, defendant can deduct only those costs which it proves were related to the infringing work. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 508 F.Supp. 798, 801 (S.D.N.Y.1981), *modified on other grounds,* 722 F.2d 988 (2d Cir.1983).

■ Defendant's overhead is also deductible, but only if the defendant can show what portion of overhead contributed to the production and sale of the infringing products. *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 86 F.Supp. 399 (S.D.N.Y. 1949), *modified,* 191 F.2d 99 (2d Cir.1951). Thus, defendant has the burden of (1) proving that each category of overhead contributed to the production of the infringing items, and (2) offering a fair and acceptable

---

**14.** Plaintiff and Petrie agree that plaintiff notified Petrie of its infringement of Style No. 8607 by a letter dated September 3, 1986. Plaintiff's Reply Memorandum of Law ("Pl. Reply Mem.") at 8; Def.Mem. at 17–18.

**15.** Plaintiff and Petrie disagree as to whether Ms. Herman was Petrie's only buyer. *See* Pl. Reply Mem. at 8–9; Defendant's Post-trial Reply

Memorandum ("Def. Reply Mem.") at 7–8. Regardless, however, Ms. Herman was one Petrie buyer who ordered garments from Lauren and who knew that these garments allegedly infringed plaintiff's copyright. Thus, with some diligent investigation, Ms. Herman could have ascertained what other styles Petrie bought from Lauren.

formula for allocating a given portion of overhead to those items. *See Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 413–14 (2d Cir.1970); *see also Frank Music Corp. v. Metro–Goldwyn Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985).

(1) Lauren

(a) *Gross Revenues*

Lauren sold each of the infringing items at the following retail prices: Style No. 9607 (sweater) was sold at the Marianne Plus division of Petrie, for $19.99; Style No. 8607 (sweater) was sold at Petrie for $15.99; Style No. 5607 (skirt) was sold at the Marianne Plus division of Petrie for $18.99; Style No. 1007 (sweater) was sold at Zayre as Style Nos. 905053 and 925053 at $16.99; Style No. 0707 (vest) was sold in the Marianne Plus division of Petrie for $16.99. Tr. 49–50; Pl. Exhs. 10A–E, 12A.

Lauren sold 2,292 pieces of the Style No. 9607 sweater; 3,270 pieces of the Style No. 8607 sweater; 2,436 pieces of the Style No. 5607 skirt; 6,444 pieces of the Style No. 1007 sweater; and 1,380 pieces of the Style No. 0707 vest.[16] Pl.Exhs. 12, 12A, 12B. Based on the prices listed above, Lauren grossed $20,398 on Style No. 9607, $26,079 on Style No. 8607, $19,244 on Style No. 5607, $55,618 on Style No. 1007, and $10,-212 on Style No. 0707—for a total of $131,-569. Tr. 67–70, 134; Pl.Exhs. 12, 12A, 12B. Lauren also sold an additional 1,010 sweaters in Style No. 8607 for $7.75 each—for a total of $7,828.[17] Tr. 78–79; Pl.Exhs. 13, 14, 14A. Thus, Lauren's total gross revenue from selling the infringing items. was $139,379.

(b) *Deductible Costs*

■ Lauren argues that payment to its contractor Lydia Knitting Mills ("Lydia") should be deducted as one of its costs. Lauren, however, failed to timely produce evidence of such payment.[18] *See* Tr. 178. Thus, the amount Lauren paid Lydia for manufacturing the sweaters is not deductible from Lauren's gross revenue.

Lauren also argues that the purchase of the yarn used to make the sweaters should be included as one of its costs. However, the invoices from Lauren's yarn supplier, National Spinning Co., indicate that the yarn was delivered to Lydia after many of the garments were manufactured. Def. Exhs. B, C; Tr. 321–26, 367–373. Furthermore, Lauren failed to establish that the yarn reflected in the invoices was actually used to make the infringing sweaters. *See* Tr. 328–29, 364–73. Although Lauren attempted to use the garment's weight to prove the cost of yarn per garment, the only evidence submitted on this point was a summary of costs with its supporting documents.[19] Pl.Exhs. D, D1; *see* Tr. 333–34,

---

**16.** Lauren argues that the 354 returned sweaters (Style No. 8607) it received from Petrie should be deducted from its gross revenues. However, because Lauren failed to establish that it either discarded or still possesses these garments, the court must presume that Lauren sold them to another buyer at the same price. Accordingly, they will not be deducted from Lauren's gross revenues.

**17.** These additional sales were made to Petrie, and were identified in Petrie's sales summaries as *"Triangles—prev. identified"* and *"# 8607* (past)". Pl.Exhs. 13, 14, 14A; Tr. 70–78.

**18.** On May 19, 1988, Judge Lloyd F. MacMahon ordered Lauren to provide plaintiff with "all documents relating to Lauren's costs associated with the manufacture of the allegedly infringing products." *See* Memorandum and Order (87 Civ. 0206) (dated May 19, 1988) at 2. In addition, Hukafit requested Lauren to (1) supply certain invoices issued by Lauren during the period June–September 1986, (2) checks of Lau-

ren to contractor(s) showing payment of invoices for the five styles in question, and (3) copies of Lauren's bookkeeping records showing payment by Lauren's customers to Lauren for invoices of the same five styles. *See* Pl.Exh. 22 at ¶¶ 1, 4, 9; Tr. 159–61. When Lauren failed to comply with Judge MacMahon's Order and Hukafit's discovery requests, Judge Miriam G. Cedarbaum entered an Order prohibiting Lauren from introducing documents "not produced prior to October 5, 1990, relating to costs" and "oral testimony regarding such costs." *See* Tr. 156–63, 176; Order (87 Civ. 0206) (dated Nov. 30, 1990) ¶¶ 1–3. At trial, therefore, this court excluded checks which allegedly paid Lauren's contractor Lydia Knitting Mills, and prohibited Mr. Lieberman from testifying on that subject. Tr. 174–83, 282–83.

**19.** The underlying documents which would have supported the summary are no longer in existence, and Lauren's principal witness, Mr. Lieberman, did not have personal knowledge of the

374–75, 170–78. The court therefore finds that Lauren has not submitted credible proof as to the cost of yarn used in manufacturing the infringing items, and accordingly, will not deduct these costs from Lauren's gross revenues.

■ Lauren also argues, and the court agrees, that certain discounts taken by Petrie should be deducted from Lauren's gross revenue. Apparently, Petrie was allowed to deduct a 3% discount from the price of the garments if Petrie paid Lauren for the merchandise within the terms of their agreement.[20] *See* Tr. 461–62, 469–470; Def.Exh. P. Thus, because Petrie received a 3% discount on its total invoice price of $47,580, Lauren's gross revenue should be reduced by that amount, i.e., by $1,427.

Lauren claims that all of its expenses in operating its business (with the exception of advertising and commissions) should be deducted as overhead. *See* Def.Mem. at 26–27; Def.Exh. E. Many of these expenses, however, did not go into producing the infringing items. For example, the list of expenses includes "design salaries," "entertaining and customer expenses," and "Christmas expense," none of which were used in the production of the infringing garments. *See* Tr. 380–85. The list also includes "salaries" of the "selling group," even though no one in the selling group

sold the infringing garments. Tr. 382–83. Because these categories of overhead did not contribute to producing or selling the infringing sweaters, they cannot be deducted as overhead expenses. Thus, Lauren's expenses amount to $1,548,057, making its overhead equal 11.1% of its gross revenue, i.e., $15,471. *See* Def.Exh. E.[21]

The court concludes, therefore, that Lauren is allowed to deduct from its gross revenue the discounts to Petrie ($1,427) and the overhead items discussed above ($15,472). Accordingly, Lauren's net profit is $122,480.

## (2) Petrie

### (a) *Gross Revenues*

■ In calculating Petrie's gross revenues, plaintiff did not include any of the markdowns by which Petrie reduced its selling price.[22] *See* Pl.Exhs. 13, 14. Contrary to plaintiff's position, however, the court finds that the markdowns must be taken into account, since they reflect the actual prices at which the garments were sold.[23] *See* Def.Exh. M; Tr. 447–73. Accordingly, Petrie's gross revenues for the five infringing styles—Style Nos. 8607, 5607, 0707, 9607—totalled $103,201.[24]

### (b) *Deductible Costs*

■ Petrie's direct costs consisted of the purchase of the garments from Lauren

information they contained. *See* Tr. 333–34, 374–79, 170–78. Furthermore, even though Lauren contends that the summary is also based on the invoices from Lydia and National Spinning, Lauren has not sufficiently evidenced or explained how it arrived at the weight of each garment and the cost of yarn per garment. *See* Def.Exhs. C, B.

20. Petrie asserts that it also took an "anticipation" discount for paying Lauren earlier than the date agreed upon. *See* Tr. 470–73. However, because Petrie did not establish the percentage of this discount, the court cannot deduct it from Petrie's gross revenue. Tr. 472–73; Def.Exh. P.

21. Lauren's proposed formula for determining its percentage of overhead consists of dividing its expenses by its total sales (net of returns). Plaintiff has not challenged this formula and the court finds it reasonable. *See* Tr. 358–59; *Dolori Fabrics, Inc. v. Limited, Inc.,* 662 F.Supp. 1347, 1356 (S.D.N.Y.1987).

22. In making its calculation, plaintiff relied on Petrie's original retail prices without any discounts. However, these prices did not include the discounts because they were prepared for the purposes of negotiating a settlement. *See* Tr. 487.

23. Plaintiff objects that Def.Exh. M is a document which was not kept in Petrie's ordinary course of business, but rather, was prepared in anticipation of litigation. *See* Tr. 451–53. The court, however, accepts the portions of Def.Exh. M which are supported by other documents kept in Petrie's ordinary business. *See* Tr. 460–73; Def. Exhs. H, I, J, K, L, P. Furthermore, although the markdown dates were not the same for all the Petrie stores, the court accepts Mr. Jackson's estimate of those dates as being fair and reasonable. *See* Tr. 457–459.

24. As discussed *supra,* the calculation of Petrie's gross revenues includes the extra 1010 sweaters in Style No. 8607. *See supra.*

($51,569).[25]  *See* Def.Exh. M;  Tr. 447–73.

Petrie also argues that it should be allowed to deduct the overhead reflected in its annual reports. *See* Tr. 474–76;  Def. Exhs. Q, R. Petrie has calculated its total costs as being 90.7% of its total net sales, and urges the court to apply that percentage to the total net sales of the infringing garments. *See* Def.Mem. at 32.

The court first notes that the category "Cost of goods sold" includes the cost to Petrie of purchasing the infringing garments from Lauren, and thus, including that category in the overhead would constitute a double deduction for Petrie. More importantly, however, Petrie has not shown how the costs reflected in these reports relate in any way to the sale of the infringing items.[26] For example, the deduction for "Occupancy Costs" in Petrie's 1987 Annual Report was for all the stores owned by Petrie—including those with different trade names—and was not limited to the stores through which the Lauren garments were sold. Tr. 503–04; Def.Exh. Q at 8. Under the heading of "Selling, General and Administrative Expenses," Petrie included the costs of opening new stores and the modernizing of existing stores—an expense which amounted to $95 million. Tr. 505–06; Def.Exh. Q at 2, 4. Petrie, however, made no showing that the opening of these stores and the modernizing of stores had any relationship to Petrie's sales of the infringing Lauren garments or that these garments were even sold through the stores that had been newly opened or modernized. The 1987 Annual Report also includes the interest on bonds issued by Petrie to acquire a new chain of stores—even though there was no showing that these new stores contained or were related to the Lauren garments—and includes a deduction for income taxes paid for in the years in question. Tr. 507–08.

Because of this lack of specificity as to which or how much of each overhead item contributed to the sale of the infringing items, Petrie is not allowed to deduct any of its overhead expenses from its gross revenue. As discussed above, however, Petrie is allowed to deduct the direct cost of purchasing the sweaters from Lauren ($51,569). Petrie's net profit, therefore, is $51,632.

(3) Zayre

(a) *Gross Revenue*

█ The shopping service used by Hukafit to police its copyrights sent Hukafit a Lauren sweater—the Style No. 1007 sweater—which was found at a Zayre store in the Boston area. *See* Tr. 107–11; Pl.Exh. 10D. Attached to the garment was the shopping service's tag, indicating that six Lauren sweaters were being sold at Zayre's for $16.99. *See* Pl.Exh. 10D. In addition, Lauren's records show that it sold 5,448 sweaters to Zayre for a total of $46,308. Furthermore, Zayre admitted in its answer (1) that it "resold certain items supplied to it by Lauren," and (2) that it "sold all the items in question," thereby mooting Hukafit's request for a preliminary injunction and impoundment of all infringing copies. Answer of Zayre, 88 Civ. 8858 (CHT), ¶¶ 11, 14 (April 4, 1989). Plaintiff argues that these facts, taken collectively, establish that Zayre earned a gross revenue from the Lauren sweaters in the amount of $46,308. Zayre, however, contends that plaintiff has not met its burden of proving Zayre's actual revenue since neither one of the admissions in its Answer specifies the quantity of garments sold.

Generally, doubts concerning the calculation of defendant's profits are resolved in favor of the plaintiff. *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 664–65 (10th Cir.) (patent case), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). In the words of the Supreme Court, "it is enough if the evidence show the extent of the damages as a matter of just and reasonable inference. . . ." *Story Parchment*

---

**25.** This includes the 3% discount for paying within terms, discussed *supra,* and the cost of purchasing the extra 1010 sweaters in Style No. 8607 less the same 3% discount.

**26.** Although Petrie had the internal records to more specifically trace the overhead expenses to particular products, it chose not to do so. Tr. 505–10.

Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562–63, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931) (antitrust case). Here, Zayre did not present any evidence to persuade the court that it did not sell all the garments it ordered from Lauren, or that it sold some of them at a price less than what was specified on the sales tag, i.e., $16.99.[27] Thus, the court agrees with plaintiff that in light of all the evidence, it is reasonable to infer that Zayre did in fact sell all 5,448 garments it purchased from Lauren at $16.99. Zayre's gross revenue, therefore, amounts to $92,562.

### (b) Deductible Costs

Zayre paid Lauren a total cost of $46,308 for the 5,448 garments it bought from Lauren. Tr. 80; Pl.Exhs. 10D, 12, 12A. Because Zayre did not allege any deductible overhead, its net profit equals the difference between its gross revenue and its costs, i.e., $46,254.

### E. Attorney's Fees

Section 505 of the Copyright Act provides that "the court in its discretion may allow the recovery of full costs by or against any party ... [and] may also award a reasonable attorney's fee to the prevailing plaintiff as a part of the costs." 17 U.S.C. § 505. Although discretionary, awarding attorney's fees is "the rule rather than the exception and should be awarded routinely." Micromanipulator Co. v. Bough, 779 F.2d 255, 259 (5th Cir.1985). Attorney's fees are awarded in order to encourage the assertion of colorable copyright claims and to deter infringement. See Diamond v. Am–Law Publishing Corp., 745 F.2d 142, 148 (2d Cir.1984); see also Roth v. Pritikin, 787 F.2d 54, 57 (2d Cir.1986) (same rationale). Furthermore, the defendant need not be an intentional infringer for the plaintiff to recover attorney's fees. See McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 322–23 (9th Cir. 1987).

Here, defendants object to an award of attorney's fees for two reasons. First, defendants contend that since none of them are intentional infringers, attorney's fees should not be awarded. See Def.Mem. at 36–38. As discussed supra, however, culpability is not a prerequisite to awarding attorney's fees to a prevailing plaintiff. Defendants also argue that the plaintiff unreasonably rejected Lauren and Petrie's offers of settlement. See Def. Mem. at 38–40. However, refusing a settlement offer does not preclude an award of attorney's fees. Quinto v. Legal Times of Washington, Inc., 511 F.Supp. 579, 582 (D.D.C.1981). Furthermore, plaintiff's refusal of defendants' settlement offers was reasonable. The court therefore concludes that an award of attorney's fees is appropriate in this case.

The amount of the attorney's fee should reflect the time that was reasonably necessary to successfully prosecute the copyright claims, including any time spent responding to motions or other actions by the adverse party. See Frank Music Corp. v. Metro–Goldwyn Mayer Inc., 886 F.2d 1545, 1557 (9th Cir.1989) (1909 Act), cert. denied, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). In determining the exact amount of the award, five factors are taken into consideration: (1) the amount of work necessary, (2) the amount of work done, (3) the skill employed, (4) the monetary amount involved, and (5) the result achieved. M. Nimmer, supra, § 14.10[C] at 14–116 to 117.

Here, plaintiff requests attorney's fees in the amount of $103,688. Pl. Mem. at 16. The court has reviewed the affidavit of plaintiff's attorney, and finds that the rates and time expended on this case were reasonable. See Affidavit of George Gottlieb (sworn to June 14, 1991). While it is true that the facts and the law involved in this case were relatively simple, plaintiff's attorney was constantly confronted with defendants' failure to respond to plaintiff's

---

**27.** Zayre contends that the confusion surrounding the issue of who was attorney of record for Zayre contributed to Zayre's inability to present its case. While this confusion was unfortunate, it is irrelevant to the fact that Zayre's case was in fact never presented to the court. As Zayre points out, this court is inclined to rely on the equities, and thus, will not allow confusion among Zayre's successive attorneys to prevent the plaintiff from receiving its justly due award.

discovery requests. These delays were so frequent that plaintiff's attorney had to obtain two different orders compelling discovery. *See* Memorandum and Order, Judge Lloyd F. MacMahon (May 19, 1988); Order, Judge Miriam G. Cedarbaum (Nov. 30, 1990). Moreover, some of the documents that Judges McMahon and Cedarbaum ordered to be discovered were not produced until the middle of trial. *See* Tr. 2–3; 156–63. Thus, the court finds that the amount of work performed on this case reasonably corresponds to the amount of work that was necessary for the plaintiff to prevail. Accordingly, plaintiff's request for attorney's fees is granted in the amount of $103,688.

## F. *Prejudgment Interest*

The Copyright Act neither provides for nor prohibits an award of prejudgment interest. Even in the absence of legislative direction, however, a court may award prejudgment interest if such an award would further the Congressional purposes underlying the statute in question. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6–7, 92 L.Ed. 3 (1947). Generally, the purposes of the Copyright Act are to compensate the plaintiff and deter the defendant from future infringement. *See* M. Nimmer, *supra*, § 14.01[A] at 14–4 to 14–5. Although awards of prejudgment interest in copyright cases have been upheld in this Circuit, the Court of Appeals has not yet squarely addressed the issue. *See Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 656 (2d Cir.1978) (affirming judgment that included prejudgment interest without discussing the issue). The most recent trend, however, has been to deny prejudgment interest because an award without prejudgment interest will sufficiently compensate the plaintiff and deter the defendant from future infringement. *See Tracy v. State Key, Inc.*, 14 U.S.P.Q.2d 1248, 1249–50, 1990 WL 9855 (S.D.N.Y.1990) (sum awarded was sufficient to serve all legitimate goals of copyright laws, "including both compensation of plaintiffs and deterrence of potential defendants"); *U.S. Payphone, Inc. v. Executives Unlimited of Durham, Inc., et al.*, 931 F.2d 888, 18 U.S.P.Q.2d 2049 (4th Cir.1991) (same); *Robert R. Jones Assoc., Inc. v. Nino Homes, et al.*, 858 F.2d 274, 282 (6th Cir.1988) (same).

Here, the court finds that the goals of the Copyright Act will be achieved without awarding prejudgment interest. Plaintiff will receive the net profits made by all three defendants, as well as the full amount it requested for costs and attorney's fees. The court concludes, therefore, that plaintiff's recovery is adequately compensatory and will sufficiently deter defendants from future infringement. Accordingly, plaintiff's request for prejudgment interest is denied.

## CONCLUSION

For the reasons set forth above, defendants are liable to plaintiff for following amounts: Lauren for $122,480; Petrie for $51,632; and Zayre for $46,254. In addition, defendants are jointly and severally liable to plaintiff for attorney's fees in the amount of $103,688. Submit judgment in conformity herewith.

So ordered.