**CENTRAL POINT SOFTWARE, INC., et al., Plaintiffs,**

v.

**GLOBAL SOFTWARE & ACCESSORIES, INC., Defendant.**

**No. CV 93–2367.**

United States District Court, E.D. New York.

March 28, 1995.

Order Amending Decision and Denying New Trial April 21, 1995.

Farrell, Fritz, Caemmerer, Cleary, Barnosky and Armentano, P.C. by Dolores Fredrich, Uniondale, NY, for plaintiffs.

McBride, Baker & Coles, Chicago, IL (Geoffrey G. Gilbert, of counsel) for plaintiffs.

Torino & Singer, P.C. by Charles A. Singer, Mineola, NY, for defendants.

Galgano & Belkin, Hauppauge, NY (Thomas Galgano, of counsel) for defendants.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

WEXLER, District Judge.

Plaintiffs Central Point Software, Inc., Computer Associates International, Inc., Datastorm Technologies, Inc., Quarterdeck Office Systems, Inc., Software Publishing Corporation, Symantec Corporation, Wordstar International, Inc., and Executive Systems, Inc. d/b/a XTree Company (collectively, "plaintiffs"), computer software manufacturers and members of the Software Publishers Association ("SPA"), bring this action against defendant Global Software & Accessories, Inc. ("Global") alleging copyright infringement for violations of the Computer Software Rental Amendments Act of 1990 (the "Rental Amendment"), P.L. 101–650, which amended section 109 of the Copyright Act, 17 U.S.C. § 109. Plaintiffs seek injunctive relief and statutory damages. By order dated August 3, 1994, this Court denied plaintiffs' motion for a preliminary injunction and directed an immediate trial. *See Central Point Software, Inc. v. Global Software & Accessories, Inc.,* 859 F.Supp. 640 (E.D.N.Y.1994). The action was tried without a jury on September 7 and 8, 1994. The following constitutes this Court's findings of fact and conclusions of law.

*FINDINGS OF FACT*

Plaintiffs are in the business of developing and marketing computer programs recorded on the medium of magnetic disks, commonly referred to as "computer software," for use on microcomputers of the type commonly referred to as "personal computers" or "PCs." Plaintiffs are the owners of copyrights in numerous computer software programs.

Global has been engaged in the business of, *inter alia,* renting computer software since 1988. Global operates three stores, each of which is located in New York. Global opened the last of the three stores in July 1993.

Plaintiffs claim that Global infringed their copyrights in various computer software programs by renting copies of those programs in violation of the Rental Amendment. The Rental Amendment, which became law on December 1, 1990, prohibits the unauthorized rental of computer software. The Rental Amendment provides in relevant part:

> [U]nless authorized by the ... owner of copyright in a computer program (including any tape, disk or other medium embodying such program),.... [no] person in possession of a particular copy of a computer program (including any tape, disk or other medium embodying such program), may, for the purposes of direct or indirect

commercial advantage, dispose of, or authorize the disposal of, the possession of that ... computer program (including any tape, disk or other medium embodying such program), by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending.

17 U.S.C. § 109(b)(1)(A).[1] As for violation of the rental prohibition, the Rental Amendment provides:

> Any person who distributes ... a copy of a computer program (including any tape, disk or other medium embodying such program) in violation of paragraph (1) is an infringer of copyright under section 501 of this title and is subject to the remedies set forth in sections 502, 503, 504, 505, and 509.

*Id.* § 109(b)(4). The Rental Amendment, however, does not prohibit the rental of a particular copy of computer software acquired before December 1, 1990; it prohibits rental of particular copies acquired on or after December 1, 1990. In this respect, the Rental Amendment provides that it

> shall not affect the right of a person in possession of a particular copy of a computer program, who acquired such copy before the date of the enactment of this Act [*i.e.*, December 1, 1990], to dispose of the possession of that copy on or after such date of enactment in any manner permitted by section 109 of title 17, United States Code, as in effect on the day before such enactment.

*Id.* § 109 foll.; Pub.L. 101–650, § 804(b).

Global's owner and president, William Morales ("Morales"), actively opposed the Rental Amendment. Indeed, Morales travelled to Washington, D.C. to lobby against the amendment and solicited the support of his computer software rental customers, 75% of whom signed a petition opposing the amendment.

On and after December 1, 1990, Global continued to rent copies of computer software that it had acquired before December 1, 1990, as permitted under the Rental Amendment. Accordingly, any such transactions are not at issue in this case. At issue is plaintiffs' claim that Global has rented, and continues to rent, copies of plaintiffs' copyrighted computer software that Global acquired on or after December 1, 1990—software the Rental Amendment prohibits Global from renting—mostly through a scheme Global devised shortly after the amendment went into effect.

Global's copies of computer software programs acquired before December 1, 1990 became obsolete as the manufacturers of those programs released "upgrades," *i.e.*, later versions, of those programs, requiring Global to devise marketing methods to maintain its rental business. One method was to rent copies of software programs it acquired on or after December 1, 1990 that were upgrades of programs it had acquired before December 1, 1990. Morales admitted that Global did this with the following software programs: Harvard Graphics, pcAnywhere, ProComm Plus, QEMM and Q & A. To justify renting these upgrades, Global relies on a pamphlet published by the SPA, entitled "Is It Okay to Copy My Colleague's Software" (the "SPA Pamphlet"). Morales claims Global received the SPA Pamphlet in or about August 1991, annexed to a letter, dated August 2, 1991, from the SPA to Global (the "SPA Letter"). The SPA Letter, however, references a different SPA pamphlet, one entitled "Software Use and the Law." That pamphlet was not introduced as evidence, and plaintiffs do not dispute that Global received the SPA Pamphlet instead. The SPA Pamphlet is in question-and-answer (*i.e.*, "Q & A") format. Morales claims that he interpreted the following Q & A in the pamphlet as permitting the rental of upgrades:

> Q *What happens when I receive an upgrade? Can I give my old version to someone else to use?*
>
> A The answer to this question is generally "no." Upgrading your software doesn't give you the right to sell or give away the earlier version. The upgrade is an improvement to the original software and not a new copy. The earlier version and the upgrade should be treat-

---

**1.** The Record Rental Amendment of 1984, P.L. 98–450, had earlier amended section 109 of the copyright law to prohibit the rental of phonograph records.

ed as elements of the same copy of software.

Morales admits, however, that neither the SPA Letter nor the SPA Pamphlet deals with the rental of computer software or the Rental Amendment. Rather, both deal with duplication of software.[2] Morales also admits that in certain instances Global rented both the pre-Rental Amendment copy and its post-Rental Amendment upgrade after December 1, 1990.

Another way Global sought to market software was through a so-called "Deferred Billing Plan" (the "DBP"), devised by Morales in March or April 1991, without the advice of legal counsel. Global used the DBP exclusively for copies of computer software it acquired on or after December 1, 1990. In short, under the DBP, Global permits its customers to take computer software home and keep it for up to five days for a fee, which Global refers to as a "nonrefundable deposit" or "restocking fee." If the customer returns the software within the five-day period, the customer is not charged the balance of the purchase price.

In practice, Global's rental and DBP transactions are substantially the same. Signs on Global's stores advertise, *inter alia*, computer software rentals. Global's brochures advertise available rental and DBP software. For rental software, these brochures indicate the "rental fee"; for DBP software, certain brochures indicate the nonrefundable deposit and purchase price, but other brochures indicate only the nonrefundable deposit. In the store, rental and DBP software are displayed together on shelves by application (*e.g.*, wordprocessing, business, utilities, *etc.*). The display packages do not contain an actual copy of the software, but rather have number and color-coded cards attached—one color for rental software and another color for DBP software. The color-coded cards contain, *inter alia*, the title of the software, an item number, the rental fee for rental soft-

ware or the nonrefundable deposit for DBP software, and the purchase price. A customer interested in particular software leaves the display package on the shelf and takes the card to an attendant at a designated counter where the actual software are stored and organized by item number. Upon payment of the rental fee or nonrefundable deposit, whichever applies, the attendant gives the customer the software in a plain white box that includes a "user's manual," but not the manufacturer's registration card.

Under the DBP, only the nonrefundable deposit is charged to the customer's credit card initially, although credit card approval is obtained for the full purchase price. The nonrefundable deposit is only a fraction of the purchase price, typically ranging from $7.50 to $20.00. The customer is given a receipt indicating when the five-day period expires. Global's store policy does not provide for extension of the five-day return period. If the customer returns the software for any reason within the five-day period, Global keeps the nonrefundable deposit and the customer is not charged the balance of the purchase price. On the other hand, if the customer does not return the DBP software within the five-day period, the nonrefundable deposit is applied to the purchase price and the balance of the purchase price is charged to the customer's credit card. Only then is the customer provided the manufacturer's registration card. The manufacturer's registration card allows the owner to register with the manufacturer. Technical support from the software manufacturer is typically available only to registered users. Morales testified that Global provides the manufacturer's registration card to the customer at the time of sale in sales of "new" software, but not in DBP transactions since they involve "used" software. This explanation is troubling since there is no indication that Global acquired the software "used"; if Global acquired it "new," then it would not have been "used" in

2. The SPA Letter advised Global that the SPA was informed that Global may have illegally copied a certain software program, and directed Global to immediately destroy any such illegal copies. The letter further states:

The [copyright] law clearly states that it is illegal to make or distribute copies of copy-

righted material without express authorization of the publisher. Any duplication except for backup and archival purposes by anyone other than the *owner* of a proprietary work is a violation of the Federal Copyright Act. Duplication of software for any other purpose is a federal crime. (Emphasis in original.)

its first DBP transaction. Morales maintains that Global withholds the registration card until the return period expires to prevent illegal copying. He reasons that if the customer is given the registration card, the customer could illegally copy the software and file the registration card with the manufacturer, but maintain the appearance of being a bonafide purchaser even after returning the software to Global.

In a rental transaction, the rental fee permits the customer to keep the software for two days. Rental fees, like the DBP nonrefundable deposits, are a fraction of the purchase price of the software. As with DBP software, if the customer returns the product within the agreed period, no further payment is due. As with DBP software, the customer is not given the manufacturer's registration card. If the software is not returned within the two-day period, rental charges continue to accrue for an additional seven days. If the software is not returned after the additional seven-day period, Global charges the customer's credit card for the additional seven days rental plus a discounted purchase price (which presumes the software is used), but only after attempts to reach the customer fail or the customer does not return the software after being contacted.

Global's records indicate that of 448 transactions summarized, approximately 300 were DBP transactions. Of the approximately 300 DBP transactions, the customer returned the software within five days in all but three transactions.[3] The balance of the 448 transactions were rentals. Of these rentals, Morales testified that approximately three-quarters were rentals of upgrades. The remaining rentals were rentals of pre-Rental Amendment copies, some of which were the earlier versions of the upgrades.

To justify its DBP as a legitimate sales plan, Global maintains that similar marketing methods are employed in the software industry. In particular, Global submits evidence of a marketing plan utilized by Intuit, a software manufacturer. Under the plan, Intuit ships a customer a particular software program for an $8 fee; this fee permits the

customer to use the program for up to 30 days or 25 uses, whichever comes first. The program automatically shuts down after 25 uses. The balance of the purchase price, $99, is automatically charged to the customer's credit card at the end of the 30–day period or earlier if the customer completes and returns the product registration card; the customer is not charged the balance if, before the 30–day period expires, the customer completes and returns a card indicating that the program does not meet the customer's needs, has not been registered, and will not be used. According to an Intuit employee, customers ultimately pay the $99 in approximately 50% of the transactions. Similarly, an employee of plaintiff Central Point Software, Inc. ("CPSI") testified that CPSI offers a 30–day guarantee on products it sells, and that the return rate is less than 1%.

Beside contesting whether it violated the Rental Amendment, Global contends that plaintiffs are barred from maintaining this action by laches. This action was commenced on May 25, 1993. The evidence establishes that Global acquired no copies of plaintiffs' copyrighted software between December 1, 1990—the date the amendment took effect—and March 30, 1992. Because the rental prohibition applies only to particular copies of computer software acquired on or after December 1, 1990, the earliest date any of the plaintiffs would have had a claim for copyright infringement against Global for violation of the Rental Amendment was March 30, 1992. Thus, this action was filed within 14 months of the earliest date on which any of the plaintiffs would have had a claim for copyright infringement against Global.

Morales testified that plaintiffs' delay led him to open a third store in July 1993, but that was two months after this suit was filed. Although Morales testified that he signed the lease beforehand, he was not sure of the date and did not offer the lease into evidence. Morales also testified that Global spent approximately $80,000 on the acquisition of additional software in 1990; $130,000 in 1991;

**3.** The parties stipulated that the transaction records summarized are a representative sample of the transaction records of Global's business. Tr. 13–14.

$125,000 in 1992; and $125,000 in 1993. However, Global's acquisition of software after the Rental Amendment took effect, and its opening of the third store, primarily reflect Global's continuation of business, and hardly show prejudice caused by reliance or change of position as a result of plaintiffs' delay.

## CONCLUSIONS OF LAW

■ As for whether Global's rental of software upgrades acquired on or after December 1, 1990 violates the Rental Amendment, Global argues that these upgrades are exempt from the rental ban. Global's theory is that the upgrade copy replaced the pre-Rental Amendment copy, and, therefore, there was only one copy. However, Global's position is undermined in that Global admittedly rented the pre-Rental Amendment copy and its post-Rental Amendment upgrade after December 1, 1990. In any event, the exemption for pre-Rental Amendment copies applies only to a "particular copy" possessed before the amendment took effect. Morales admitted that the upgrades were copies of plaintiffs' copyrighted software that Global had acquired after the amendment took effect. These copies, therefore, are subject to the amendment's rental ban. Moreover, as Morales admits, neither the SPA Letter nor the SPA Pamphlet, purportedly relied on by Global, related to the rental of computer software or the Rental Amendment. Thus, Global rented copies of these upgrades in violation of the Rental Amendment.

■ As for whether Global's DBP transactions violated the Rental Amendment, this Court's interpretation of the statute starts with its language. See, e.g., Community for Creative Non–Violence v. Reid, 490 U.S. 730, 739, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811 (1989) ("The starting point for our interpretation of a statute is always its language."). The Rental Amendment prohibits not only the rental of computer software, but "any other act or practice in the nature of rental, lease or lending," 17 U.S.C. § 109(b)(1)(A). The statute, however, does not define the quoted phrase, and apparently there are no reported cases interpreting this language in the context of alleged computer software rentals.

Global argues that this Court is required to look to state law to determine whether a transaction is a sale or a rental under the Rental Amendment. In this respect, Global contends that its DBP transactions are not prohibited by the Rental Amendment because a DBP transaction would be considered a "sale on approval" under Article 2 of New York's Uniform Commercial Code, see N.Y.U.C.C. § 2–326(1) (McKinney 1993). Plaintiffs argue that Global's DBP transactions are, in substance, the rental of computer software in violation of the Rental Amendment, and "sale[s] in name only," as evidenced by the nearly 100% return rate. Global counters that plaintiffs' reliance on the percentage of returns is "flawed and illogical" because there is no basis for comparison with industry-wide statistics, and because "misreliance on statistics creates a situation where transactions may not be classified as sales or rentals until a significant period of time (undefined) has elapsed after the transactions have been completed so that the incidence of returns may be examined." Defendant's Letter Submission, dated October 3, 1994, at 2. In response, plaintiffs argue that the Rental Amendment's language and legislative history "make clear Congress' intent that enforcement of the rental prohibition not be thwarted by formalistic interpretations of state law." Plaintiffs' Letter Submission, dated September 23, 1994, at 1.

In deciding whether a transaction is a sale or a rental under the Rental Amendment, this Court must construe the amendment " 'in light of the mischief to be corrected and the end to be attained,' " NLRB v. Hearst Publications, Inc., 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944) (quoting South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 259, 60 S.Ct. 544, 549, 84 L.Ed. 732 (1940)). The Rental Amendment was intended to address the threat rental of computer software posed to the computer software industry. See H.Rep. No. 735, 101st Cong., 2d Sess. 8 (1990), reprinted in 1990 U.S.C.C.A.N. 6802, 6935, 6939. Congress considered the threat posed to the computer software industry by rental of software "even

more compelling" than the threat posed by the rental of phonograph records to the record industry. *Id.* In this respect, Congress recognized that

> [t]he price disparity between the sale and rental prices is greater than the case with phonorecords: software selling for $495 has been rented for $35. And unlike phonorecords, which are an entertainment product, software is typically a utilitarian product. Short term rental of software is, under most circumstances, inconsistent with the purposes for which software is intended. Rental of software will, most likely, encourage unauthorized copying, deprive copyright owners of a return on investment, and thereby discourage creation of new products.

*Id.*

The purpose of the rental ban, as reflected in the Senate Report on companion legislation passed in the Senate in May 1990, "was to protect the investment of software publishers in their copyrighted computer programs by preventing rental, lending, leasing, or *similar disposal* of copyrighted software for direct or indirect commercial gain without the copyright holder's permission." S.Rep. No. 265, 101st Cong., 2d Sess. 2, 7 (1990) (emphasis added). Congress considered then-existing protections afforded copyright holders of computer software inadequate because of the first sale doctrine,[4] and because "the market for rental of computer programs exhibits several characteristics that could facilitate or even promote illegal copying of rented software by lessees." *Id.* at 3. As Congress recognized:

> Despite the protection of the copyright law, abuses of software copying remain.

The easy accessibility of computer programs distributed in magnetic media format, together with the widespread distribution of popular applications programs, has led to persistent illegal copying of these programs.

*Id.*

The Record Rental Amendment of 1984, which amended section 109 of the Copyright Act to prohibit the rental of phonograph records, added the language at issue in this case, *i.e.,* "any other act or practice in the nature of rental, lease, or lending." The legislative history to that amendment indicates that Congress intended that language to

> cover transactions which common sense indicates are equivalent to rentals, but which may be disguised in an attempt to avoid liability under the law. For example, a retailer who "sold" an album to be "bought back" a few days later, or a club organized to lend records to its members who paid a membership fee rather than a direct rental fee, would be performing acts or practices in the nature of rental, lease or lending and would be in violation of the law unless permission of the copyright owner had been obtained.

*See* H.Rep. No. 987, 98th Cong., 2d Sess. 4 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2898, 2901 (emphasis added); *see, e.g., A & M Records, Inc. v. A.L.W., Ltd.,* 855 F.2d 368, 370 n. 6 (7th Cir.1988).

■ The Act's language and its legislative history demonstrate that Congress intended to proscribe not only transactions that are called rentals, but also practices that are in substance rentals. Although, as between

---

4. Under the first sale doctrine, once a software producer sold a copy of the copyrighted program, the new owner of the copy could sell, rent or otherwise dispose of the copy without the copyright holder's consent. *Step Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91, 96 n. 7 (3d Cir.1991). Because of the ease of copying software, software producers were concerned that purchasers of various copies of computer software would rent them to consumers for a short duration, allowing the consumer to duplicate the software, rather than purchase it. *Id.* Although the software producer could sue the consumer who made the illegal copy, it was not economically feasible to identify and sue each

individual consumer, and the first sale doctrine stood as a barrier to suit against the rental company. *Id.* As a result, software producers began employing licensing agreements with these purchasers to establish a basis in state contract law for suing the rental companies directly. *Id.* However, questions remained whether the use of state contract law to avoid the first sale doctrine was statutorily or constitutionally preempted. *Id.* In response, Congress passed the Rental Amendment, modifying the first sale doctrine to permit only non-profit libraries and non-profit educational institutions to rent, lend or lease copies of copyrighted software. *Id.* (citing 17 U.S.C. § 109(b)(1)(A)).

transacting parties (*e.g.*, Global and its customers), whether a transaction is a "sale on approval" is one of state law,[5] this determination does not control the determination of rights afforded the copyright owner (*e.g.*, plaintiffs) by the federal copyright statute.[6] Where a practice is, in substance, no different from rental, the practice is prohibited regardless of whether, under state law, the transaction may be considered a "sale on approval" between buyer and seller.

Based on the evidence presented, this Court finds that Global's DBP operates as a "practice in the nature of rental" under the Act, and, therefore, is prohibited. A combination of factors indicate that Global is, in substance, engaged in rental of software under the DBP: the nearly 100% return rate; certain DBP brochures advertise only the "nonrefundable deposit," not the purchase price; the "nonrefundable deposits" are comparable to rental fees; the relatively short DBP term is comparable to the rental term, obviously allowing Global to use the same copy of software in another DBP transaction within a short time; and the customer is not given the manufacturer's registration card until the purchase price is paid. Even though it is the customer's choice whether to return the software, given the nearly 100% return rate, Global should have known that its DBP operated substantially the same as its legitimate software rentals.[7] *Cf. A & M Records,* 855 F.2d at 370 n. 6.[8]

As for Global's reliance on Intuit's plan or any other manufacturer's marketing plan, Global ignores the obvious: a manufacturer is not barred from renting its own software; the Act expressly recognizes that a manufacturer is free to authorize rental of its copyrighted software. Thus, whether Intuit's plan or any other manufacturer's plan is in substance a sale or a rental is irrelevant, as are any similarities between those plans and Global's DBP.

By its decision, this Court does not construe the Act to prohibit a return policy which allows a customer truly unsatisfied with a particular copy of a computer software program to return the software in exchange for a refund of the purchase price, less a true "restocking fee."[9] Such a business practice,

---

5. Global relies on the following remarks of Representative Kastenmeier, Chairman of the House Judiciary's Subcommittee on Courts, Intellectual Property, and the Administration of Justice, for the application of state law in determining whether a DBP transaction is a sale or a rental:

 > [Q]uestions have arisen with respect to purchase leasebacks of ... software, and, software purchase return policies. The question whether a transaction is a sale or a lease is typically one of State law.

 136 Cong.Rec. H13315 (1990).

6. Section 2–326 protects the seller's interest in "goods held on approval" from "claims of the buyer's creditors" until acceptance, and section 2–327 determines the passage of risk of loss and title between buyer and seller. Whereas UCC sections 2–326 and 2–327 may regulate the rights of parties to a commercial transaction involving computer software, the copyright statute protects the rights of a third party—the intellectual property owner—in the subject matter of that transaction.

7. There is no evidence that these programs were unsatisfactory. Indeed, that Global repeatedly marketed the same programs indicates that they were not unsatisfactory.

8. In *A & M Records,* a number of record companies sued the operators of several record rental stores for copyright infringement for renting copyrighted records in violation of the Record Rental Amendment of 1984 (the "RRA"). On appeal from the district court's grant of plaintiffs' motion for summary judgment, the Seventh Circuit decision notes that the district court held the defendants in contempt for violating the district court's permanent injunction against renting records covered by the RRA. In opposing the contempt motion, the defendants contended they "no longer rent records, but merely sell them pursuant to a buy-back provision." 855 F.2d at 370 n. 6. The buy-back plan worked as follows: "customers ... may buy a record for two dollars plus a five dollar deposit, which will be returned at the customer's choice within a specified time limit." *Id.* The district court apparently held that defendants, through the buy-back plan, violated the RRA's prohibition against "practices in the nature of rentals."

9. Indeed, the Act's legislative history suggests that such a practice is permitted:

 > It has been argued that software rental serves consumers by allowing them to examine and consider expensive software packages before buying them. However, this legitimate consumer need appears to have been met through alternative means. Many dealers now permit the customer to try software packages in the store before purchase. *Others permit return exchange of unsatisfactory software.* These

aside from its apparently prudent business implications, appears to fall outside the Act's rental ban. However, these are not the circumstances presented here.[10]

■ As for Global's laches defense, the burden of proving laches is on Global. *See In Design v. Lauren Knitwear Corp.*, 782 F.Supp. 824, 831 (S.D.N.Y.1991); *American Express Co. v. American Express Limousine Serv. Ltd.*, 772 F.Supp. 729, 737–38 (E.D.N.Y.1991). "The party asserting the laches defense must establish (1) that the delay was unreasonable and (2) that the delay resulted in prejudice." *In Design*, 782 F.Supp. at 831. Here, the delay was no more than 14 months—the time between the earliest date any of the plaintiffs' claims could have accrued (March 1992) and the date this action was commenced (May 1993). It is well settled that the time to sue does not start to run until the claim arises. *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.06, at 12–116 (1993) (hereinafter *"Nimmer"*). Under the circumstances, this delay was not unreasonable. Indeed, delays of greater length generally are not unreasonable. *See, e.g., In Design*, 782 F.Supp. at 831 (delay of two years not unreasonable). Moreover, even if the 14-month delay was unreasonable, Global failed to prove sufficient prejudice resulting from the delay. Global's proof that its business continued during the period of the alleged delay is, under the circumstances, insufficient prejudice for laches. *See, e.g., American Express*, 772 F.Supp. at 737–38 (defense of laches " 'requires more by way of showing

prejudice than the simple fact that the business continued during the period of delay' " (quoting *Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1098 (S.D.N.Y.1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979))). Under the circumstances, Global has not shown sufficient prejudice caused by its reliance or change of position as a result of plaintiffs' delay.

■ Plaintiffs proved that Global rented particular copies of software acquired after the Act took effect under its upgrade theory in violation of the Act. Plaintiffs also proved that Global's DBP constitutes a "practice in the nature of rental" of computer software in violation of the Act. Both forms of conduct were for commercial advantage and constitute copyright infringement, *see* 17 U.S.C. §§ 109(b)(1)(A), 501. There is reason to believe that such conduct may continue; accordingly, plaintiffs are entitled to permanent injunctive relief, subject to the parties' stipulation of software eligible for this relief.[11] *See id.* § 502(a); *Nimmer, supra* § 14.06[B], at 14–94.3 to –94.4; *see, e.g., Encyclopedia Britannica Educ. Corp. v. Crooks*, 542 F.Supp. 1156, 1187 (W.D.N.Y.1982) (plaintiff is entitled to permanent injunctive relief in copyright action when liability has been established and there is a threat of continuing violations). Counsel for plaintiffs is directed to submit a draft decree to this Court within 15 days from the date of this order.

■ Plaintiffs have elected to recover an award of statutory damages, instead of

practices obviate the need for prepurchase rental of software which may lead to copying abuse.

S.Rep. No. 265, 101st Cong., 2d Sess. 5 (1990) (emphasis added); *see also* 136 Cong.Rec. H13315 (1990) (statements of Rep. Kastenmeier) ("We ... should not disturb legitimate commercial activities that routinely involve a variety of products, one of which may include software. For example, most retail stores have return policies for purchases of products. Sometimes these policies include restocking charges. Where software is purchased under such policies, there is no rental or lease. On the other hand, where a store offers to repurchase software for a substantial part of the purchase price and offers free blank diskettes for copying, questions may arise

whether the activity involves indirect commercial advantage.").

10. This Court also rejects Global's argument that the Rental Amendment is unconstitutionally vague, *see* Defendant's Letter Submission, dated September 19, 1994, at 2.

11. The parties stipulated that permanent injunctive relief, if awarded in this case, would apply to all software products identified in the plaintiffs' proposed amended complaint and/or in the exhibits identified in the schedule attached to the proposed revised pretrial order. Tr. 12. Further, the parties stipulated that the copyrights for those software products are valid and enforceable. Tr. 13.

actual damages and profits, for all infringement involved in this action. *See* 17 U.S.C. § 504(c). Based on this Court's finding of infringement, plaintiffs are entitled to an award of statutory damages. *See id.* § 504(c)(1).[12] A party is entitled to an enhanced award of statutory damages if it proves, and the court finds, that the infringement was committed willfully. *Id.* § 504(c)(2). Copyright infringement is willful when it is done with knowledge that it is in violation of the owner's copyright or with "reckless disregard" for the copyright owner's rights. *See RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,* 845 F.2d 773, 779 (8th Cir.1988); *Fitzgerald Publishing Co. v. Baylor Publishing Co.,* 807 F.2d 1110, 1114–1115 (2d Cir.1986); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.,* 519 F.Supp. 730, 733 (S.D.N.Y.1981). This Court concludes, based on the findings above, that Global rented software under its upgrade theory in reckless disregard of plaintiffs' copyrights in the upgrades. This Court also concludes, based on the findings above, that Global rented software under its DBP in reckless disregard of plaintiffs' copyrights. It defies belief that the DBP was devised to comply with the Act; and even if it was devised with that intent, it should have become clear to Morales and Global that the DBP functioned, in substance, as nothing more than the rental of computer software. Consequently, Morales should have known that Global was not selling software under the DBP. Accordingly, based on this Court's finding of willful infringement, plaintiffs are entitled to an award of statutory damages in an amount to be determined by this Court.

In addition, plaintiffs are also entitled to an award of attorney's fees and costs pursuant to 17 U.S.C. § 505, in an amount to be determined by this Court.

The parties are directed to contact the Court to set a date for a hearing for the purpose of determining statutory damages and attorney's fees and costs.

SO ORDERED.

## ORDER AND AMENDMENT TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

Defendant Global Software & Accessories, Inc. ("Global") moves for an order granting a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure based on this Court's reference in footnote 10 of the Court's Findings of Fact and Conclusions of Law, dated March 28, 1995 ("March 28 Findings and Conclusions"), to Global's failure to comply with Local Rule 33 in challenging the constitutionality of 17 U.S.C. § 109. Familiarity with the March 28 Findings and Conclusions is assumed. Plaintiffs oppose the motion. Upon review of the docket, the Court notes that Global did indeed comply with the requirements of Local Rule 33. Because the Court rejected Global's constitutional challenge on the merits, as indicated in the first portion of footnote 10, Global's motion is denied except to the extent that the reference to Global's failure to comply with Local Rule 33 in footnote 10 is deleted. Thus, footnote 10 should read in full: [Editor's Note: change incorporated for publication purposes].

SO ORDERED.

---

12. The parties have stipulated that damages are limited to the amount that could be awarded upon proof of the infringement of a single copyrighted work, *i.e.,* $100,000, *see* 17 U.S.C. § 504(c)(2). Tr. 12. The parties further stipulated that the total monetary relief afforded plaintiffs, including attorney's fees and costs, may not exceed $150,000. Tr. 13.